George P. SHULTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

RADIO OFFICERS' UNION OF the UNITED TELEGRAPH WORK-ERS, Defendant.

No. 70 Civ. 2334.

United States District Court, S. D. New York.

April 19, 1972.

Whitney North Seymour, Jr., U. S. Atty., New York City, by Milton Sherman, Peter A. Herbert, Asst. U. S. Attys., of counsel for plaintiff.

Marvin Schwartz, New York City, for defendant.

PIERCE, District Judge.

MEMORANDUM OPINION

This is an action brought by the Secretary of Labor pursuant to the Labor-

Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 29 U.S.C. § 401 et seq. He seeks to set aside as null and void the 1969 election for the offices of President and National Committeeman—Oakland of the Radio Officers' Union (hereunder ROU) under 29 U.S.C. § 482(b). The Secretary bases his complaint upon two separate incidents of alleged election misconduct, each of which he asserts "may have affected the outcome of the election." He also seeks an order directing defendant to conduct a new election for the aforesaid offices under his supervision.

## I. FINDINGS OF FACT

1. At all times relevant to this action, defendant, Radio Officers' Union, was an unincorporated association, maintaining its principal office at 225 West 34th Street, City of New York, County of New York, State of New York, within the Southern District of New York.

2. At all times relevant to this action, defendant was a local labor organization engaged in an industry affecting commerce within the meaning of Sections 3(i), 3(j), and 401(c) of the Labor-Management Reporting and Disclosure Act of 1959 (hereafter referred to as the "LMRDA"), 29 U.S.C. §§ 402(i, j), and 481(c).

3. At all times relevant to this action, defendant was chartered by and subordinate to the Commercial Telegraphers' Union, AFL–CIO (hereafter referred to as the "International"), an international labor organization engaged in an industry affecting commerce within the meaning of sections 3(i), 3(j), and 401(c) of the LMRDA, 29 U.S.C. §§ 402(i), 402(j), and 481(c).

4. During the period from May 15, 1969, through December 1, 1969, defendant had approximately 830 members.

5. During the period from May 15, 1969, through December 1, 1969, defendant was a party to collective bargaining agreements with approximately 80 companies that owned and operated cargo ships and tanker ships.

6. On various occasions during the period from May 15, 1969, through December 1, 1969, a majority of defendant's active and MSTS members were employed aboard cargo and tanker ships operating in international waters by companies with whom defendant had collective bargaining agreements. During the foregoing period, the number of ships operated by such companies was approximately four hundred.

7. In accordance with its by-laws then in force, defendant conducted a general election of its officers during the period from May 15, 1969, through November 30, 1969, (hereafter referred to as the "1969 election"). The period from May 15, 1969, through August 15, 1969, was the nominating period, and the period from September 1, 1969, through November 30, 1969, was the balloting period.

8. During the period from May 15, 1969, through August 15, 1969, defendant's members nominated candidates for the following offices in accordance with the procedures set forth in article 11 of defendant's by-laws: President; National Secretary-Treasurer; and two National Committeemen for each of New York, New Orleans and Oakland.

9. All active, inactive, and MSTS members of defendant in good standing were eligible to be nominated for each of the offices set forth in paragraph 8 hereof. In order to be nominated, section 5 of article 11 of defendant's by-laws required that a member in good standing receive at least ten nominating votes.

10. In accordance with the procedures set forth in article 11 of defendant's by-laws, R. C. Smith (hereafter sometimes referred to as "Robert C. Smith"), a member of defendant, was nominated as a candidate for the office of President of defendant in the 1969 election. Pursuant to section 4 of article 12 of defendant's by-laws, Mr. Smith notified defendant's National Secretary-

Treasurer, in writing, before August 20, 1969, that he accepted the nomination and that he desired to have his name placed on the official election ballot as a candidate for the office of President. At all times relevant to the 1969 election, Mr. Smith was eligible under the provisions of defendant's by-laws to have his name placed on the official election ballot as a candidate for the office of President, and to hold that office if he were elected.

11. In accordance with the procedures set forth in article 11 of defendant's by-laws, Lester F. Parnell, a member of defendant continuously in good standing during the period from September 1, 1968, through September 1, 1969, was nominated as a candidate for the office of National Committeeman for Oakland, California. At all times relevant to the 1969 election, Mr. Parnell was eligible under the provisions of defendant's by-laws to have his name placed on the official election ballot as a candidate for the office of National Committeeman for Oakland, California, and to hold that office if he were elected.

12. At the time of his nomination, Lester F. Parnell was retired and he was receiving a pension from defendant's pension and welfare fund. The pension was Mr. Parnell's only source of income in 1969. Prior to his retirement, Mr. Parnell had been employed by defendant as its Port Representative for Oakland, California, for approximately 20 years.

13. Shortly after Lester F. Parnell accepted his nomination as National Committeeman for Oakland, California, and indicated in writing his intention to run for that office, he received a telephone call from Edward F. Fitzgerald, defendant's National Secretary-Treasurer. Mr. Fitzgerald stated to Mr. Parnell that he should withdraw acceptance of the nomination because he was retired and an inactive member of defendant. When Mr. Parnell refused, Mr. Fitzgerald stated that he nevertheless would send Mr. Parnell the necessary form by which to withdraw his candidacy.

14. On or about August 4, 1969, Mr. Parnell received by mail from defendant a form, requiring his signature, indicating that he did not accept the nomination for National Committeeman, Oakland, and that he did not wish to have his name appear on the election ballot. Mr. Parnell rewrote the form to state that he accepted the nomination and wished his name to appear on the election ballot, signed the form, and returned it to defendant by certified mail requesting a return receipt. Thereafter, Mr. Parnell received the return receipt stating that the form had been received by defendant.

15. On or about August 18, 1969, Joseph P. Glynn, President of defendant, telephoned Lester F. Parnell. Mr. Glynn first spoke with Dora Parnell, Mr. Parnell's wife, who answered the telephone. Mr. Glynn told Mrs. Parnell to tell her husband that if he were elected as National Committeeman he might jeopardize his pension. Immediately thereafter, Mr. Glynn spoke with Mr. Parnell on the telephone and told him that if he were elected to the office of National Committeeman, he might jeopardize his pension. Mr. Glynn concluded his converstion with Mr. Parnell by asking him to send a telegram stating that he withdrew his candidacy.

16. On August 18, 1969, in response to Mr. Glynn's statements Lester F. Parnell sent a collect telegram to Joseph P. Glynn, as President of defendant, addressed to defendant's office in New York City, stating that he did not choose to run for any office in the 1969 election.

17. Under the regulations governing eligibility for a pension from defendant's pension and welfare fund, Lester F. Parnell, as the recipient of a pension and as an inactive member of defendant, was entitled to hold the office of National Committeeman without forfeiting or in any way jeopardizing his right to

continue to receive his pension under the plan.

18. During the period from May 15, 1969, through November 30, 1969, defendant maintained an addressing machine together with various sets of membership cards at its New York City office. One set of cards listed the home addresses of various members of defendant; another set of cards listed the names of all ships that were owned by the companies with whom defendant had collective bargaining agreements, the addresses of those ships, and the designation "Radio Officer".

19. In August of 1969, Robert C. Smith, after having been nominated for the office of President of defendant and accepting the nomination in writing, visited defendant's office to obtain a list of its members for the purpose of addressing his campaign literature. In response to his request for a complete membership list, Mr. Smith was provided with a list of the names of defendant's members and their residence addresses. Smith was told by incumbent President Glynn that this was the list he, Glynn, would use to mail literature during the campaign.

20. While at defendant's New York office, Mr. Smith requested permission from defendant's President, Joseph P. Glynn, to examine and to photocopy the sets of cards used by defendant to address and mail material to its members and described in paragraph 18 hereof. Mr. Glynn refused to permit Mr. Smith to use or examine the address cards.

21. In addressing campaign literature during the balloting period of the 1969 election, Joseph P. Glynn, the incumbent President of defendant and a candidate for reelection to that office in the 1969 election, on behalf of himself and other incumbent officers running for reelection in the 1969 election, employed the addressing machine and the membership address cards and the ship name cards used in connection therewith described in paragraph 18 hereof.

22. In mailing the election ballots to its members, defendant employed the addressing machine and the cards used in connection therewith described in paragraph 18 hereof.

23. The candidates for offices in the 1969 election, and the offices to which they sought election were as follows:

| Office | Candidates |
|---|---|
| President | Joseph P. Glynn |
| | Robert C. Smith |
| National Secretary-Treasurer | Edward F. Fitzgerald |
| National Committeemen for New York | John T. Conroy |
| | Edwin Cook |
| | James C. Pavlakis |
| National Committeemen for New Orleans | Leon J. Breedlove |
| | Kenneth J. Wright |
| National Committeemen for Oakland | St. Clair Barrymore |
| | Charles D. Calhoun |
| | Glen L. Jewett |

24. At the time of the 1969 election, Joseph P. Glynn was the President of defendant; Edward F. Fitzgerald was the National Secretary-Treasurer; Edwin Cook was one of the two National Committeemen for New York; Leon J. Breedlove and Kenneth J. Wright were the National Committeemen for New Orleans; and St. Clair Barrymore and Glen L. Jewett were the National Committeemen for Oakland. The foregoing incumbent officers of defendant, and John T. Conroy, a candidate for National Committeeman for New York, campaigned jointly and ran for re-election as a slate in the 1969 election.

25. On September 1, 1969, election ballots bearing the names of the candidates set forth in paragraph 23 hereof were mailed by defendant to its members. The period during which members could vote their ballots ran from September 1, 1969, through November 30, 1969. Members voted their ballots and returned them by mail to the First National City Bank, which held all voted ballots that it received until November 30, 1969, in accordance with section 3 of article 12 of defendant's by-laws.

26. Pursuant to section 5 of article 12 of defendant's by-laws, ballots for the 1969 election which were returned by defendant's members to the First National City Bank were secured, counted, and

certified by defendant's Balloting Committee. The results of the 1969 election, as certified by the Balloting Committee were as follows:

| Office | Candidate | Votes |
|---|---|---|
| PRESIDENT | Joseph P. Glynn | 308 votes |
| | Robert C. Smith | 172 votes |
| | Edwin Cook | 1 vote |
| SECRETARY-TREASURER | Edward F. Fitzgerald | 430 votes |
| (write-in) | Robert C. Smith | 1 vote |
| (write-in) | Charles G. Karafotias | 1 vote |
| (write-in) | Kenneth R. Cossaboom | 1 vote |
| (write-in) | Charles D. Calhoun | 1 vote |
| NATIONAL COMMITTEEMAN NEW YORK | Edwin Cook | 359 votes |
| | John T. Conroy | 290 votes |
| | James P. Pavlakis | 172 votes |
| NATIONAL COMMITTEEMAN NEW ORLEANS | Leon J. Breedlove | 395 votes |
| | Kenneth J. Wright | 380 votes |
| NATIONAL COMMITTEEMAN OAKLAND | St. Clair Barrymore | 328 votes |
| | Glen L. Jewett | 269 votes |
| | Charles D. Calhoun | 223 votes |

27. On December 26, 1969, Smith communicated to Glynn his intention to protest the election. Glynn responded on January 9, 1970, that such notice was not timely filed. On January 15, 1970, Smith mailed a letter to Glynn, the President of the International, and to each member of defendant's national committee setting forth the reasons for his appeal. On January 26, 1970, Glynn responded that his earlier letter still stood. On February 16, 1970, Smith mailed a copy of his January 15 letter to the International President of the United Telegraph Workers and to the members of the Executive Board of the International union. The International President denied his appeal.

28. By telegram to the United States Department of Labor, dated March 12, 1970, R. C. Smith filed a complaint with the Department of Labor with respect to the conduct of the 1969 election.

29. By letter dated March 12, 1970, mailed on March 16, 1970, and received on March 26, 1970, R.C. Smith filed a second complaint with the Department of Labor with respect to the conduct of the 1969 election. Smith also mailed to the Department of Labor a copy of his letter dated January 15, 1970, to the President of the International and to each member of defendant's National Committee.

30. The telegram and letter described in paragraphs 28 and 29 hereof were timely filed under the provisions of section 402(a) of the LMRDA, 29 U.S.C. § 482(a).

31. By letter dated February 23, 1970, addressed to the Secretary of Labor, mailed on or about March 3, 1970, and received by the Department of Labor on March 4, 1970, Joseph M. Penot, a member of defendant, filed a complaint with respect to the conduct of the 1969 election. In his complaint, Mr. Penot charged, inter alia, that (1) defendant denied Lester F. Parnell the right to be a candidate; (2) defendant denied to the membership its right to vote for Mr. Parnell; and (3) defendant failed to conduct the 1969 election in accordance with section 4 of article 12 and section 2 of article 14 of the by-laws.

32. The letter described in paragraph 31 hereof was timely filed under the provisions of section 402(a) of the LMRDA, 29 U.S.C. § 482(a).

33. Prior to filing his complaint with the Department of Labor, Joseph M. Penot exhausted the remedies available to him under defendant's by-laws and the International constitution.

34. The Secretary of Labor investigated the complaints filed with him by R.C. Smith and by Joseph M. Penot and found probable cause to believe that violations of Title IV of the LMRDA, 29 U.S.C. § 481 et seq., had been committed by defendant in the course of conducting its 1969 election.

## II. DISCUSSION

### A. *The Parnell Incident*

In 29 U.S.C. § 481(e) Congress provided that "every member in good standing shall be eligible to be a candidate and to hold office . . . and shall have the right to vote for or otherwise support the candidate or candidates of his choice without being subject to . . . improper interference or reprisal of any kind by such organization or any member thereof." Plaintiff asserts that Lester Parnell, a retired radio officer and a member of ROU, was denied the right to be a candidate and to hold office because Joseph Glynn, ROU President, improperly interferred with Parnell's candidacy causing him to withdraw from the campaign. Further, the plaintiff contends that other union members were denied the right to vote for or support Parnell by virtue of this interference. The plaintiff avers that, some time during mid-August, 1969, in a telephone conversation between Glynn and Parnell, Glynn coerced Parnell into withdrawing from the race for National Committeeman-Oakland by saying to him that he "might jeopardize his pension" if he did not withdraw.

### 1. *The Violation*

 Lester Parnell testified that he construed Glynn's request that he withdraw as a threat. Glynn testified that he did not intend to threaten or coerce Parnell but simply called to tell him that by running for the office of National Committeeman he "might jeopardize his pension." Both Glynn and Parnell testified that they knew the union rules did not provide for loss of his pension if he won the election but Parnell stated: "The rules change and some people don't live by the rules." The Court is convinced that Parnell interpreted Glynn's remarks, not unreasonably, as a threat and he therefore withdrew from the race. Thus, Lester Parnell's rights under § 481(e) were violated, as were those of other voters.

### 2. *Impact on the Election*

The Court must consider whether the violation "may have affected the outcome" of the election.[1] If so, the relief sought by plaintiff as to the office of National Committeeman-Oakland must be granted. 29 U.S.C. § 482(c)(2).

The rule governing the standard of proof which the Secretary of Labor must meet in order to establish that the outcome of the election may have been affected was announced in Wirtz v. Hotel, Motel & Club Employees Union, 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968). There it was held that a proved § 481 violation should be treated as prima facie proof that the outcome was affected. *Id.* at 506–507, 88 S.Ct. 1743. *See* Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 405 F.2d 176, 177 (3d Cir. 1968). The Court held such construction "peculiarly appropriate" where the violation was exclusion of a candidate, citing with approval Wirtz v. Local Unions 410, 410A, 410B & 410C, Int'l Union of Operating Eng'rs, 366 F.2d 438 (2d Cir. 1966). In this latter case,

1. Defendant does not contend that internal union remedies were not exhausted with reference to the Parnell incident. The fact that one Joseph Penot, another member of ROU, protested the union's action in coercing Parnell to withdraw and ultimately presented his grievance to the Secretary of Labor, does not affect the validity of this aspect of the complaint. Wirtz v. Local Union No. 705, Hotel & Restaurant Employees, 389 F.2d 717 (6th Cir. 1968); Wirtz v. Local Union No. 57, 57–A, 57–B, & 57–C, Int'l Union of Operating Eng'rs, 293 F.Supp. 89 (D.R.I.1968).

the Court noted that attempting to estimate the impact on the outcome of an election of a candidate represented an exercise in speculation; the requirement of § 482(c)(2) is met if there is a reasonable probability that the outcome may have been affected by the violation.

Here the Secretary has established a violation and therefore prima facie proof that the outcome was affected. Defendant has not adduced a single shred of evidence tending to rebut the presumption that its interference with Parnell's candidacy affected the election results. The Court notes that Parnell was a popular member of the ROU, having been elected to the office of National Committeeman-Oakland eight or nine times prior to his retirement. The Court concludes that there was a reasonable probability that the outcome of the election for National Committeeman-Oakland may have been affected by the withdrawal of Parnell.

### B. *The Smith Incident*

The Secretary of Labor contends that the ROU discriminated in favor of the incumbent President regarding the use of its membership list. He argues that

Smith, the insurgent presidential aspirant, requested a list of the names and residence addresses of union members and that Smith did not receive the most recently compiled list. Second, the Secretary asserts that Smith asked for the list of ships then under contract with the ROU which the incumbent had used for mailings,[2] but did not receive it. Third, the secretary contends that even if Smith did not ask for the ship list, defendant was obliged to provide it because the incumbents at that point had already mailed campaign flyers to both members' residences and to ROU ships, and were contemplating future such mailings, which were in fact made.[3] Thus, it is alleged that even without Smith's specific request the union was under a duty to provide the ship list in order to avoid discriminating against him. Fourth, the Secretary contends that internal union appeal procedures were properly invoked to no avail, and that defendant's infractions "may have affected the outcome of the election."

Defendant ROU asserts the internal union protest filed by Smith was untimely and that therefore the Secretary's complaint relating to the Smith incident must be dismissed.[4] Further-

2. The claim that the ship list had been used by Glynn prior to Smith's mid-August visit was apparently based on a portion of stipulation 23 contained in the pre-trial order. In open court defense counsel repudiated that portion of the stipulation arguing that it resulted from error on his part. In view of the fact that Glynn testified at trial that he did not make use of the Scriptomatic addressing machine prior to the balloting period, this portion of the stipulation is considered to have been amended accordingly.

3. *See* text accompanying note 2 *supra*.

4. Defendant also asserts that the Court cannot consider plaintiff's theory that the ship list should have been provided even without a request. It advances this position on the grounds that the theory was not within the Secretary's contemplation when he determined, as required by statute, that there was prob-

able cause to believe a violation had occurred. This contention is without merit. This is not a case where the Secretary has brought suit based on a § 481 violation not previously presented to the union by the protesting member. *See* Hodgson v. Local Union 6799, United Steelworkers, 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971); Wirtz v. Local Union 257, Glass Bottle Blowers Ass'n, 273 F.Supp. 746 (D.N.J. 1967) and cases cited therein. Other than inquiring into such an issue, the Court may not scrutinize the Secretary's finding of probable cause. Ewing v. Mytinger & Casselberry, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); Wirtz v. Am. Guild of Variety Artists, 267 F.Supp. 527, 534 (S.D.N.Y.1967); Wirtz v. Local 30, Int'l Union of Operating Eng'rs, 242 F.Supp. 631, 633 (S. D.N.Y.1965), rev'd on other grounds, 366 F.2d 438 (2 Cir. 1965); Wirtz v. Local 30, Int'l Union of Operating Eng'rs, 34 F.R.D. 13, 14 (S.D.N.Y.1963).

more, the defendant ROU takes the position that Smith's testimony that he requested the ship list during his mid-August visit to union offices is unworthy of belief, and that, if no such request was made, the Secretary has failed to state a violation cognizable under § 481(c). Finally, defendant contends that even if Smith's appeal within the union was timely, and the complaint does state a violation, it did not affect the outcome of the election.

### 1. The Timeliness of Smith's Internal Union Protest

In advancing its theory that Smith's internal union protest was not timely filed, defendant has cited Article 26, § 12(f) of the Commercial Telegraphers' constitution which requires that "notice of intention to appeal" be filed "within ten days after the action complained of is taken." It takes the position that Smith's protest of December 26, 1969, was untimely since the ballots had been counted on December 1, 1969.[5] The Secretary argues that § 12(f) relates to the subordinate unit's power to interpret contracts, schedules and agreements and was not intended to govern election appeal situations.

There is no indication in the Commercial Telegraphers' constitution that § 12(f) relates to election protests. Rather § 12, including subsection (f), does indeed seem aimed directly at subordinate unit regulation of internal disputes regarding contracts and the like.[6] The Court finds support for this interpretation in an analysis of the precise language of § 12(f) as it applies to the instant situation. The "action complained

of" here, was, in the strictest sense, the acts through which the union allegedly discriminated against Smith, permitting Glynn to mail campaign literature using the ship list for addressing purposes. The precise dates of these acts could not possibly have been known to Smith, nor, obviously, could he have been expected to file a notice of intention to appeal within the 10 day period which followed. The counting of the ballots which occurred on December 1, 1969, cannot be said to represent the commencement of the ten day period since it only reflected Glynn's victory; it did not constitute the union "action complained of." Thus, it does appear that § 12(f) is, as the Secretary asserts, a time limitation on appeals from union action which may be ascribed to a definite date, such as refusal to process a member's contract grievance, rather than from election misconduct.

Despite the apparent correctness of this view, on January 9, 1970, President Glynn ruled that the 10 day period specified in § 12(f) governed the timing of election protests and that Smith's December 26, 1969, protest was therefore untimely. As President, Glynn is empowered to act as final arbiter of the parent union constitution and the ROU by-laws. ROU By-Laws, Article 7, § 8. The Secretary does not challenge his authority in this respect.

Regardless of Glynn's interpretation, however, the Court finds Smith's protest was timely filed. Smith testified that he first learned of Glynn's victory one or two days after the ballot count while he was at sea. He overheard two ROU members discussing the

---

5. Defendant cites only one case to support application of its theory of untimeliness. At pages 10–11 of its Trial Memorandum defendant directs the Court's attention to Wirtz v. Great Lakes District Local No. 47, 240 F.Supp. 859 (N.D.Ohio 1965) as a situation where the Secretary's complaint was dismissed on the grounds that the complainant union member had failed to

timely file an internal union protest. In actuality, in that case the motion to dismiss was denied and a protest made 34 days after the ballots were counted was held timely.

6. The Secretary's position would be far more persuasive if the introductory language of section 12 was followed by a colon instead of a period.

Producing.

election results over a side band radio used in the "North Atlantic trade." He testified that he learned the exact tally from this conversation but did not record the figures since he had no assurance that they were correct. The ROU did not communicate this information to him in a formal notice at any time prior to December 26, 1969, when he filed his notice of intention to appeal. Instead he independently determined the precise election results some time in mid-December 1969, after he had returned to this country. Smith testified that the precise figures were critical to his decision whether to appeal, for if he had been defeated overwhelmingly he would not have protested the election. In light of the requirement of § 482(c) (2), discussed *supra*, this seems an eminently sensible position.

Whatever § 12(f) means, under Glynn's interpretation, it cannot mean that an individual must file a notice of intention to appeal before he has sufficient information to determine the likely efficacy of the protest. The responsibility for Smith's lack of knowledge of the election results rests with the ROU. Thus the defendant failed to trigger the running of the 10 day period; it cannot now be permitted, under the direction of the incumbents alleged to have violated § 481, to exalt the technical ten day requirement in order to preclude inquiry into whether the "free and democratic" elections sought to be guaranteed by § 481 were in fact conducted. *See* Hodgson v. Liquor Salesmen's Union, 444 F. 2d 1344 (2d Cir. 1971). *See also* Hodgson v. Local Union 6799, United Steelworkers, 403 U.S. 333 at 341, n. 6, 91 S. Ct. 1841, 29 L.Ed.2d 510 (1971). Smith filed his notice of intention to appeal 25

days after the ballots were counted. The union has not demonstrated that this delay was so unreasonably lengthy that it would have been prejudiced in any efforts to rectify the alleged misconduct.[7] Therefore Smith's internal union appeal is found to have been timely made.

### 2. *The Violation*

Turning to the question of whether the union discriminated against Smith with regard to its membership lists, § 481(c) specifies that upon "reasonable request" of any bona fide candidate for office the union must mail campaign literature, at the candidate's expense, to all "members in good standing" and refrain from discrimination against any candidate. The section further provides that every bona fide candidate may inspect a list of members and their last known addresses at the principal office of the union. The Department of Labor regulation relating to this latter provision declares that the labor organization must refrain from discrimination with respect to the use of the lists of members. It continues to state that although the statute does not require that a candidate be permitted to copy the lists, if any candidate does make a copy, "all bona fide candidates must be accorded the same privilege." 29 C.F.R. § 452.9(b) (1971).

This view has been approved by the courts. *See* Conley v. Aiello, 276 F. Supp. 614, 615–616 (S.D.N.Y.1967); Wirtz v. Am. Guild of Variety Artists, 267 F.Supp. 527, 545–546 (S.D.N.Y. 1967). Moreover, it appears entirely consistent with the general tenor of the statute. The intent of the Congress was to establish fair and democratic proce-

---

7. The purpose of the exhaustion requirement is to grant a union the opportunity to redress an election violation independently of government intervention. Hodgson v. Local Union 6799, United Steelworkers, 403 U.S. 333, 339, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971); Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 389 U.S. 463, 472, 88 S.Ct. 643, 19 L.Ed. 2d 705 (1968). It was not designed to be invoked by the union to "stifle" consideration of a complaint on the merits. *Id.* 403 U.S. at 340–341, 91 S.Ct. 1841, 29 L.Ed.2d 510; Hodgson v. Liquor Salesmen's Union, 444 F.2d 1344 (2d Cir. 1971).

dures in union elections.[8] As part of the statutory plan, all bona fide candidates must be permitted to satisfy themselves that the membership lists are comprised of bona fide union members, not fictitious persons or non-member supporters of the incumbent or any other candidate. Copying of the list is made unnecessary by that part of § 481(c) which requires the union to use a standard membership list in mailing campaign literature for every candidate. But should the union go beyond the specific mandate of the inspection provisions, and permit any candidate to copy the list, the legislative purpose of establishing fair and democratic election procedures dictates the conclusion that all candidates must be accorded similar treatment.

 In the instant case, it is apparent that Smith's undisputed request to copy the membership list had no legal import. There is no evidence that Glynn copied or used the residence address cards prior to the time of Smith's visit, although the union had made a list from the then updated cards to be available to candidates upon request. And in any event, Smith was simply entitled to ask the union to mail his campaign literature at his expense.[9] The union provided the copy of the most recently compiled residence address list gratuitously in what Glynn described as an effort to comply with the law. The fact that Glynn sub-

sequently used the Scriptomatic addressing equipment to speed the processing of his own campaign material is not an act of discrimination against Smith since Smith had a statutory right to have his literature addressed through the same process but preferred to obtain a list and address the mail himself. The Court finds no discrimination violation with respect to the residence address list.

The Court finds that Smith requested the ROU ship list [10] upon his visit to the ROU office in mid-August of 1969.[11] The remaining question then is whether the ROU was under an obligation to furnish the ship list to him. This issue is presented, first, because it is undisputed that following Smith's mid-August visit to the ROU office, Glynn used the union's addressing facilities and its ship list in sending election campaign material to ROU members. Second, there is reason to believe that Glynn knew at the time of Smith's mid-August visit that he (Glynn) intended to make use of the ship's list for election campaign purposes: (i) Glynn had used the union's addressing machinery and ship's list in the preceding presidential election in 1967 and (ii) Glynn's attorney agreed during the instant trial that Glynn had such knowledge. (Tr. 32).[12] Third, whoever had access to the ship's list and used it, obviously, had a distinct advantage over candidates who did not since it

---

8. Wirtz v. Hotel, Motel & Club Employees Union, 391 U.S. 492, 496–499, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968); Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 389 U.S. 463, 470–472, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968).

9. Smith testified that he invoked his right under § 481(c) to have the ROU mail his literature on one occasion. The mailing of the material was apparently delayed at union headquarters for about two weeks. There is some question as to the cause of this delay.

10. A ship list contains the names of the ships under ROU contract and the name of the companies which own the respective ships and the respective addresses of the companies.

11. Numerous inconsistencies are present in the testimony of both Smith and Glynn. The Court's conclusion is based primarily on its observation of the demeanor of the witnesses as they testified and the inclination of the witness to speak truthfully or untruthfully. Smith asked to copy the Scriptomatic cards and he did seek, and obtain, Glynn's assurances that the latter would mail campaign literature using only the membership list given him.

12. The record is unclear as to whether Glynn had utilized the Scriptomatic cards to compile a ship list during the 1969 campaign prior to Smith's visit.

provided the opportunity for campaign mailings to be sent to those union members who were aboard ship at sea for weeks at a time. See discussion *infra.* The union, through the incumbent Glynn, furnished only the ROU members' residence addresses to Smith and failed to furnish the ship list, although it was requested, and although Glynn knew he intended to use the ship list himself, as he had done in the 1967 election.

 While initially the union was under no obligation to furnish any list at all to Smith, once a list was provided, it was required to give the identical list to all candidates, upon request. Whether or not Glynn had aready used the cards extensively [13] or copied them [14] is not determinative; he anticipated using them. To hold otherwise would logically impel the following conclusion: an incumbent could be permitted to refuse to provide a particular type of membership list to a candidate, upon request, where none had been given to any other candidate, with the expectation that the incumbent would use the list after all such inquiries had been made. He could then claim no legal obligation to share the list since no request for the list postdated its actual use. If the congressional intent to insure "free and democratic" elections is to mean anything, it must mean that the manner of discrimination practiced here, seemingly proper refusal by the incumbent to provide the ship list but in anticipation that he would use it later, is impermissible.

 The rationale underlying the holding that the union was obliged to furnish the ship list is bolstered by the fact that the ship list plays a particularly critical role in an ROU election. In a very real sense the "last known address" of certain members during the election period can be ascertained only from the ship list. In unions where the members remain in a given locale, an ordinary membership residence address list would be sufficient to meet a candidate's need for mailing information. But the reality of ROU elections is that individual members are not necessarily reachable through their residence addresses during the 90 day nominating period or during the 90 day balloting period; members are frequently at sea for several months at a time. Addressing mail to "Radio Officer", in care of ships, the names of which are obtained from the ROU ship list, enables a candidate to communicate with ROU members at sea. In light of the time periods involved, the only feasible method of assuring timely distribution of campaign literature to all ROU members is to employ the ship list in conjunction with the residence address list. Thus in the circumstances of this case, as a matter of law, the phrase "list containing the names and last known addresses of all members" located in § 481(c) must be read to include the ship list.

3. *The Impact on the Election*

The Court has found that the protest underlying the secretary's complaint was timely filed with the union and it is otherwise uncontested that internal union remedies were exhausted. It has also concluded that the union violated § 481(c). The remaining question is whether there is a reasonable probability that the infractions "may have affected the outcome of the election" to the office of President. Such a finding is prerequisite to the granting of relief. See discussion *supra.*

Smith stated that he compiled his own ship list, from various sources, which consisted of approximately 200 vessels or about half the number under ROU

---

13. Glynn did make use of some cards to update his personal ship list. There is no clear evidence that this occurred during the election period in question.

14. For purposes of determining whether § 481(c) has been violated, the physical act of making a copy of the membership list is irrelevant; discrimination in making the address cards available for addressing or mailing campaign material would constitute union misconduct.

contract. Assuming that the other 200 ships were at sea during the relevant time periods, it is possible that the union members aboard these vessels never received Smith's campaign literature. A change of only 69 votes from Glynn to Smith would have resulted in a Smith victory. It is also to be noted that over 350 eligible members did not vote in the Presidential race; had Smith been able to induce 137 of these men to vote for him he could have won. There is no evidence indicating how many of these non-voters were aboard the 200 vessels Smith did not reach.

 The union has failed to introduce any rebuttal evidence demonstrating that the violation was innocuous. The Court is not required to engage in speculation on this issue. The Court thus must conclude that there is a reasonable probability that the outcome of the election may have been affected by the violation.

### III. CONCLUSION OF LAW

1. The Court has jurisdiction over this action pursuant to the provisions of Section 402(b) of the LMRDA, 29 United States Code, § 482(b).

2. R. C. Smith and Joseph M. Penot, the members of defendant who filed complaints with it with respect to the 1969 election, exhausted their internal remedies and filed timely complaints with the Secretary of Labor, in accordance with the provisions of Section 402(b) of the LMRDA, 29 U.S.C. § 482(b).

3. The defendant discriminated against R. C. Smith, a candidate for the office of President in the 1969 election, with respect to the use of lists of members, in violation of Section 401(c) of the LMRDA, 29 U.S.C., § 481(c).

4. The defendant denied Lester F. Parnell, a member in good standing, the right to be a candidate for and to hold the office of National Committeeman for Oakland, and the right to support the candidates of his choice, without being subject to improper interference or reprisal of any kind, in violation of Section 401(e) of the LMRDA, 29 U.S.C. § 481(e).

5. As the result of the violation in paragraph 4 hereof, defendant denied each of its members the right to vote for and otherwise support the candidates of their choice without improper interference by defendant, in violation of Section 401(e) of the LMRDA, 29 U.S. C., § 481(e).

6. Each of the violations set forth in paragraphs 3, 4, and 5 hereof "may have affected the outcome" of the 1969 election, within the meaning of Section 402(c) (2) of the LMRDA, 29 U.S.C. § 482(c) (2).

Judgment for plaintiff.

Submit order.