422 F.Supp. 1221 (1976)
W. J. USERY, Secretary of Labor, United States Department of Labor, Plaintiff,
v.
INTERNATIONAL ORGANIZATION OF MASTERS, MATES AND PILOTS, INTERNATIONAL MARITIME DIVISION, ILA, AFL-CIO, Defendant.
No. 72 Civ. 5031.
United States District Court, S. D. New York.
March 17, 1976.
*1222 Robert B. Fiske, Jr., U. S. Atty., by Dennison Young, Jr., Bobby C. Lawyer, New York City, for plaintiff; Francis V. La Ruffa, Regional Sol., U. S. Dept. of Labor, New York City, by Rudolph E. De Meo, New York City, of counsel.
Marvin Schwartz, P. C., Burton M. Epstein, New York City, of counsel, for defendant.
Jaffe, Cohen, Berman & Crystal by Ernest Allen Cohen, New York City, for amici curiae Frank T. Scavo, Gerald L. Johnson and Timothy Brown.
MOTLEY, District Judge.

MEMORANDUM OPINION ON MOTION FOR SUMMARY JUDGMENT
This action was brought by the Secretary of Labor of the United States Department of Labor pursuant to Section 402 of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 482. In the complaint, plaintiff alleges that the defendant union during the course of its 1971 election of officers committed various violations of Section 401 of the LMRDA, 29 U.S.C. § 481, which therefore require that the election be overturned. Accordingly, the complaint asks that this court void the 1971 election of officers of the International Organization of Masters, Mates and Pilots ("IOMM & P") and order a new election subject to the supervision of the Secretary of Labor.
While the complaint alleges a number of violations of 29 U.S.C. § 481, for purposes of the instant motion for summary judgment plaintiff has limited consideration to five claimed violations:
1) The preparation and August 19, 1971 mailing by the IOMM & P of the "60th Convention Newsletter on the Resolution of Affiliation of the IOMM & P with the ILA" ("Newsletter"), which plaintiff contends constituted campaign literature prepared in violation of 29 U.S.C. § 481(g) and distributed in violation of 29 U.S.C. § 481(c);
2) The preparation and November 26, 1971 mailing by the IOMM & P of another *1223 document entitled "All Constitutional Amendments and Resolution of the 60th Convention RatifiedAffiliation of IOMM & P as the International Maritime Division of the ILA (AFL-CIO) Affirmed," which plaintiff similarly contends to be campaign literature distributed in violation of 29 U.S.C. §§ 481(c) and 481(g);
3) The election procedure followed in the 1971 election of the IOMM & P Offshore Division Vice-Presidents for the Atlantic and Gulf areas, which allegedly, in violation of various provisions in 29 U.S.C. § 481(e), prohibited many members in the Offshore Division's Atlantic and Gulf areas from participating in any way in the selection of said two Vice-Presidents;
4) The failure to mail ballots within 30 days after the close of nominations for the International and Offshore Division offices in the 1971 action, contrary to Article V, Section 8(d) of the IOMM & P Constitution, and therefore contrary to 29 U.S.C. § 481(e) of the LMRDA which provides that an "election shall be conducted in accordance with the constitution and bylaws of [the labor union] insofar as they are not inconsistent with the provisions of this subchapter;" and
5) The failure on the part of Local 88 (now the Port of New York) to comply with its bylaw that "[a] certified mailing list of all members of Local 88 shall be made available at cost to all candidates, provided however that any postage charges shall not be billed to this organization," which, if proven, also constitutes a 29 U.S.C. § 481(e) violation, as in item 4 above.
Defendant in turn has itself moved for summary judgment or, in the alternative, for partial summary judgment. The union's independent motion for summary judgment seeks to dismiss the complaint on the ground that it is moot, in view of the intervening election conducted by the defendant in 1974[1] and the facts and circumstances surrounding such election. This is also the position taken by amici curiae Frank T. Scavo, Gerald Johnson and Timothy Brown, who, as candidates in the 1974 election, challenged the incumbents who had been elected in 1971, with the result that Scavo and Johnson replaced such incumbents in the position of President and Executive Vice-President of the IOMM & P.
Defendant's alternative motion for partial summary judgment seeks dismissal of certain alleged violations of 29 U.S.C. § 481 described in the plaintiff's complaint, but not urged by him in his motion for summary judgment currently under consideration. In addition, defendant has cross moved for summary judgment as to the violation alleged to have occurred in connection with the 1971 election of the IOMM & P Offshore Division Vice-Presidents for the Atlantic and Gulf areas.
For the reasons set out below, this court has decided to grant plaintiff's motion for summary judgment, thereby voiding the 1971 election of IOMM & P officers, and accordingly orders that a new election be held under the supervision of the Secretary of Labor. Defendant's motions are in effect thereby mooted. In reaching this conclusion, the court has had to make a series of preliminary determinations which will now be considered seriatim.

Exhaustion of Remedies
A threshold question raised by defendant is whether or not union members who complained to the Secretary of Labor regarding the 1971 election, thereby triggering this action, properly fulfilled the exhaustion of remedies requirements set out in 29 U.S.C. § 482. Section 482(a) requires a complaining union member to file his complaint with the Secretary within one month of having exhausted remedies available under the constitution and bylaws of the union or within one month after invoking the available remedies without obtaining a final decision within three months after their initial invocation. In the instant case, 16 complaining members, through their attorney, Burton Hall, wrote to the General Executive Board, the final appellate body of the union, setting forth their complaints on *1224 January 19, 1972. The General Executive Board met on January 25 and 26, 1972 to consider these appeals, and by letter of February 29, 1972, postmarked that date and received March 2, 1972, the union advised the complaining members through Burton Hall that their appeals had been denied on January 26, 1972. The members thereafter filed their complaints with the Secretary on March 29, 1972, within one month of the mailing and receipt of the February 29, 1972 letter.
Defendant now contends that the complaints should have been filed with the Secretary by February 26, 1972, one month after the actual decision by the General Executive Board. Defendant alleges that the complainants were aware that the General Executive Board was meeting on January 25 and 26, and therefore implies that they knew or should have known that some action was taken on their complaints at that time. Defendant does not allege that complainants actually were notified. Given these circumstances, the court finds that the complainants cannot be held to have exhausted all internal remedies until actual formal notification that the appeal was denied. To decide otherwise would place an undue burden on those invoking the protections afforded under 29 U.S.C. § 482. A unionas did defendant union herecould hold off notifying complainants of a disposition in their case until after a month had elapsed, thereby precluding them from bringing such action to the Secretary of Labor, unless through their own efforts they had discovered and acted upon the union's disposition. Certainly such a procedure does not comply with the Supreme Court's mandate that "unions [are] expected to provide responsible and responsive procedures for investigating and redressing members' election grievances." Wirtz v. Local No. 125, Laborers' International Union, 389 U.S. 477, 484, 88 S.Ct. 639, 642, 19 L.Ed.2d 716 (1968). Nor does it comport with the admonition of the Second Circuit, in affirming a decision rendered by this court, that "procedural perversion of the exhaustion requirements of § 402(a) will not be permitted." Hodgson v. Liquor Salesmen's Union, Local No. 2 of State of N. Y., 444 F.2d 1344, 1350 (2d Cir. 1971). In that case, defeated candidates were held to have successfully exhausted their remedies, though through circumstances beyond their controla mail strikethey had been unable to file an appeal with the union within the brief time allotted by the union constitution.
In Shultz v. Radio Officers' Union of United Telegraph Workers, 344 F.Supp. 58 (S.D.N.Y.1972), Judge Pierce was faced with a situation analogous to the present action. In that case, defendant union argued that the complainant had not timely filed his complaint ("intention to appeal") with the union within 10 days as a union constitutional provision required. The union argued that the complainant's December 26, 1969 appeal was untimely because the election ballots had been counted December 1, 1969. The complainant argued that he had not been made fully aware of the final results until December 26, 1969. While the court ultimately found the 10 day provision to be inapplicable, it went on to find the complaint timely filed under such provision nevertheless. Judge Pierce specifically found that the union "did not communicate this information [election results] to [the complainant] in formal notice at any time prior to December 26, 1969." 344 F.Supp. 67. He noted that "[t]he responsibility for Smith's [the complainant] lack of knowledge of the election results rests with the ROU [the union]. Thus the defendant failed to trigger the running of the 10 day period. . . ." 344 F.Supp. 67.
In the instant case, the running of the one month period prescribed in 29 U.S.C. § 482 was similarly triggered by the letter of February 29, 1972, notifying complainants of the General Executive Board's decision. A complaint was filed with the Secretary of Labor within one month thereafter, and thus the exhaustion of remedies requirements were duly fulfilled.

Mootness
Another argument put forward by defendant union, which serves as the underpinning *1225 of its summary judgment motion, is that the present action is moot and ought to be dismissed, in view of the intervening election conducted by the defendant and the facts and circumstances surrounding such intervening election. This is also the theory put forward by the three amici curiae appearing in this case, each of whom was a candidate in the 1974 election, and two of whom successfully unseated incumbents who had been elected in the 1971 election.
Defendant union argues that the staging of a new election under the Secretary's supervision would be unnecessary and redundant. It maintains that none of the defects alleged to have affected the 1971 election were repeated in the 1974 voting. It maintains further that any possible taint resulting from 1971 irregularities had been eradicated by the time of the 1974 election, citing the fact that a large majority of those candidates running on the slate of President Thomas O'Callaghan, which had been victorious in 1971, were defeated in the 1974 voting.
Even assuming that none of the irregularities alleged to have taken place in the 1971 election were repeated during the 1974 electionwhich is not a question properly before this court at this time[2]the court is unable to conclude that no taint remained from the 1971 violations themselves. In Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968), the Supreme Court stated unequivocally that the statutory scheme to remedy election violations by a supervised election would be unfulfilled by "the happenstance intervention of an unsupervised election." 389 U.S. 474, 88 S.Ct. 649. The Court continued:
"The notion that the unlawfulness infecting the challenged election should be considered as washed away by the following election disregards Congress' evident conclusion that only a supervised election could offer assurance that the officers who achieved office as beneficiaries of violations of the Act would not by some means perpetuate their unlawful control in the succeeding election." 389 U.S. 474, 88 S.Ct. 650.
Nor can the defendant union rely on the fact that a majority of those elected in the 1971 election were unseated in 1974, since, as the Supreme Court stated, the purpose of the scheme set up by the LMRDA was not "merely to protect the right of a union member to run for a particular office in a particular election . . . for Congress emphatically asserted a vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member." 389 U.S. 475, 88 S.Ct. 650.
Congress intended to guard against a multiplicity of influences which the results of a tainted election may have on subsequent union activities. In this case, for example, the results of the 1971 election may not only have allowed incumbents to have maintained a personal advantage for the 1974 election, but also may have prevented others from rightfully developing the same benefits of incumbency. Others, too, may have withheld their candidacies in *1226 1974 preferring to await an election that was supervised by the Secretary of Labor. In all respects the day to day decisions of the union leadership may have been different over the last three years had other officers been elected in 1971, and such differences may have led to different results in 1974. Just because incumbents do not win re-election does not mean that the subsequent unsupervised election was not in some way affected by the results of the challenged election. The possible influences on the outcome of the 1974 election are incalculable and the only way to guard against them is to have the remedial election supervised by the Secretary. A supervised election guards against much more than just incumbents flaunting their incumbency at the time of the subsequent unsupervised election.

Burden of Proof and Appropriateness of Summary Judgement
The standards to be applied by the court in determining the appropriateness of the supervised election remedy are set forth in Section 402(c) of the LMRDA, 29 U.S.C. § 482(c):
"(c) If, upon a preponderance of the evidence after a trial upon the merits, the court finds
* * * * * *
(2) that the violation of Section 481 of this Title may have affected the outcome of an election, the court shall declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary . . ."
It is clear from the statute that a preliminary determination which must be made by the court before ordering a remedial election is that a violation of 29 U.S.C. § 481 has indeed taken place. This in itself does not suffice, however, since the statute requires an additional finding that such violation "may have affected the outcome of an election." In the case of Wirtz v. Hotel, Motel & Club Employees U., Local 6, 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968), the Supreme Court considered extensively the burden of proof which should be applied in determining whether or not this finding can be made. In its decision, the Court articulated the principle that a proved violation of Section 481 establishes a prima facie case that the violation "may have affected the outcome" of the election and that the only way a defendant union may overcome such a prima facie case is to prove that the violation did not affect the outcome of the election.
In that case, the Secretary alleged and the Supreme Court so held, that a bylaw of the defendant local limiting eligibility for major elective offices to union members who held or had previously held certain elective office was not a "reasonable qualification" to hold office as prescribed in 29 U.S.C. § 481(c) and that the enforcement of the bylaw may have affected the outcome inasmuch as it denied members the opportunity to hold elective office. The Supreme Court then ordered a new election held under the Secretary's supervision.
The Court examined the factors considered by the district court and reasoned that the factors presented by the defendant union did not constitute evidence which met the prima facie case established by the violation itself:
"None of the factors relied on is tangible evidence against the reasonable possibility that the wholesale exclusion of members did affect the outcome. Nothing in them necessarily contradicts the logical inference that some or all of the disqualified candidates might have been elected had they been permitted to run." 391 U.S. 508, 88 S.Ct. 1752.
Thus, once a Section 481 violation has been demonstrated, a very substantial burden falls upon a defendant union. It must show by a preponderance of the evidence that the particular violation did not affect the outcome of the election. Until it does so, the presumption remains that such violation might have had an effect on the results, and this presumption of mere possible influence suffices to warrant a new supervised election.
This burden on the union is so great as to be insurmountable in some cases. For example, *1227 in Wirtz v. Local Unions 410, etc., 366 F.2d 438 (2d Cir. 1966), the Second Circuit considered an election in which it found that some union members were deprived by the union constitution of a "reasonable opportunity" to become candidates for union office contrary to § 481. Although the case was ultimately dismissed on grounds of mootness, the court did consider the burden involved in determining the actual effect of the violation on the election results. The court ultimately decided that "there can be no tangible evidence available of the effect of this exclusion on the election." 366 F.2d 443. This court reached the identical conclusion with regards to a fact pattern very similar to that in this case. In Hodgson v. Liquor Salesmen's Union, Local No. 2 of State of New York, 334 F.Supp. 1369 (1971), aff'd 444 F.2d 1344 (2d Cir. 1971), this court considered union journals published just prior to an election and found them to contain statements designed to promote the candidacy of incumbents in violation of 29 U.S.C. § 481. There, too, the court found that "`there can be no tangible evidence available' of the effect of the violation." 334 F.Supp. 1369 (1971).
In both of the above cases, the courts found that there was a "reasonable probability" that the violations had affected the outcome of the elections in a way sufficient to warrant invalidation of the elections (although this was not the ultimate resolution of Wirtz v. Local Unions 410, etc., because of a mootness issue.). An application of the prima facie principle articulated by the Supreme Court in Wirtz v. Hotel, Motel & Club Employees U., Local 6, supra, would make even this separate finding of "reasonable probability" unnecessary, in cases where there is insufficient evidence available one way or the other as to the effect of a proven violation of 29 U.S.C. § 481 on an election. In such cases, the contested election must be invalidated.
A question which arises from this analysis is the appropriateness of summary judgment in those cases where it can be shown that there is no genuine issue of material fact either as to the commission of a 29 U.S.C. § 481 violation or as to the inability of the union to produce evidence sufficient to overcome the presumption that such violation may have influenced the results of the election at issue. The relevant statute, 29 U.S.C. § 482(c), does, it is true, specify that the court is to act "upon a preponderance of the evidence after a trial upon the merits." (emphasis added). In interpreting this provision, however, the courts have generally concurred that summary judgment is not precluded. Brennan v. Local U. No. 639, Int. Bro. of Teamsters, etc., 161 U.S.App.D.C. 173, 494 F.2d 1092 (1974); Hodgson v. District 6, U.M.W., 474 F.2d 940 (6th Cir. 1972); Schultz v. Independent Employees Union, 62 L.C. ¶ 10,869 (E.D.Wis.1970); Wirtz v. Local 1622, Carpenters, 285 F.Supp. 455 (N.D.Cal.1968). Contra: Hodgson v. District 5, U.M.W., 68 L.C. ¶ 12,867 (W.D.Pa.1972). In the only case from this circuit cited by either party as relevant to this particular question, Judge Lasker had no qualms in granting summary judgment where union funds were used to distribute material found to be campaign literature. Brennan v. American Guild of Variety Artists, AFL-CIO, et al., Civ. 74-3004 (S.D.N.Y.1974). However, the sole remedy afforded in that decision was apparently a declaratory judgment, rendering it largely irrelevant to present considerations.
This court ultimately adopts the reasoning put forward on this question by the Circuit Court for the District of Columbia in Brennan v. Local U. No. 639, Int. Bros. of Teamsters, etc., supra. There, the court, upon examining the legislative history of the LMRDA and the tradition of judicial interpretation of congressional labor legislation, concluded that the essential feature regarding adjudication under 29 U.S.C. § 482(c) was that a new election could only be ordered by an Article III Court acting according to the procedural panoply incumbent on such a court. The court concluded that "it would be sheer folly to require the expense and delay of a trial when other methods of resolution are available" and noted that "Rule 56 itself has strict requirements *1228 which must be satisfied before summary judgment can be granted." 494 F.2d 1096. This court concurs.

The Alleged Violations
It having been decided that summary judgment is at least theoretically available in the instant case, it remains for this court to consider the particular violations alleged by the Secretary to determine whether any of them actually warrants such a resolution.
On August 19, 1971, the IOMM & P mailed to each of its members a document entitled "60th Convention Newsletter on the Resolution of Affiliation of the IOMM & P with the ILA." The cost of the preparation, duplication and distribution of this Newsletter was paid for with monies received by the IOMM & P by way of dues, assessments or similar levy, and the union expended more than $3,000 on the preparation, duplication and distribution of the Newsletter. It was sent to approximately 10,400 members in a mailing done using addresses on file at the union International headquarters on a computerized list. Although the union purports that the Newsletter deals only with its merger with the International Longshoreman's Association, the Secretary maintains that the document contains campaign statements vilifying the opposition and praising incumbents. Therefore, the Secretary alleges that the Newsletter involves three separate union violations of the prohibitions of 29 U.S.C. § 481:
1) By preparing and distributing this campaign literature using union resources, the union violated § 481(g);
2) By distributing the Newsletter using its lists of members, the union did not "refrain from discrimination in favor of or against any candidate with respect to the use of lists of members" in violation of § 481(c); and
3) By failing to offer "similar distribution at the request of another bona fide candidate," the union violated § 481(c) in another respect.
These allegations have, in fact, already been at least partially litigated. With respect to the Newsletter, three insurgent candidates, on September 16, 1971, brought an action in the Southern District of New York against the union and three incumbent candidates. They alleged, inter alia, that the Newsletter was campaign literature prepared and distributed at the expense of the defendant union and that their request to have the IOMM & P distribute their comparable literature prior to the balloting had been denied in violation of 29 U.S.C. § 481(c).
In a decision dated October 18, 1971, Sheldon v. O'Callaghan, 335 F.Supp. 325 (S.D.N.Y.1971), Judge Croake stated:
"The court finds that the `Newsletter,' containing electioneering for the incumbent candidate, ad-hominem, attacks upon an opposition candidate, coupled with the timing of the distribution, constitute campaign literature for defendant O'Callaghan distributed at the expense of defendant labor organization. Plaintiffs are entitled to the opportunity to have campaign literature distributed in a similar manner and with equal force as that of the defendants." 335 F.Supp. 327-28.
Judge Croake went on to deny injunctive relief restraining the mailing of ballots until after plaintiffs' campaign materials had been sent out, noting that "[t]he LMRDA provides for post-election remedies, so as to prevent blocking or delaying of Union elections while affording adequate relief through enforcement by the Secretary of Labor . . ." 335 F.Supp. 328. It is precisely such "post-election" remedies which are being sought in the present action.
This court, in examining the Newsletter itself and considering the context in which it was distributed, concurs in the opinion of Judge Croake that the Newsletter constitutes campaign literature distributed in violation of 29 U.S.C. § 481. However, it is also the conclusion of this court that such a finding by this court is not an essential element to the resolution of the present action, because the defendant union is already bound by the finding to the *1229 same effect in Judge Croake's opinion. As a party to the action before Judge Croake in which the identical issueas to whether the Newsletter was campaign material distributed at the expense of IOMM & Pwas litigated in a similar context as the one herein, the IOMM & P is collaterally estopped from asserting any findings contrary to those made by Judge Croake. Zdanok v. Glidden Co., 327 F.2d 944, 954-56 (2d Cir. 1964), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). The union contends that this particular question was not "fully litigated" by Judge Croake since the decision was based on the submission of the Newsletter itself and affidavits describing its contents and the context in which it was distributed, rather than on an evidentiary hearing. However, such material was clearly all the information necessary for the disposition of such a question, and the judgment on such question was therefore "final" in the sense required by Zdanok:
"`Finality' in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." 327 F.2d 955, citing Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 89 (2d Cir. 1961), cert. denied, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962).
It thus being determined that the publication and distribution of the Newsletter constituted a violation of 29 U.S.C. § 481, a prima facie case has been made out for the proposition that such violation may have affected the outcome of the 1971 election, warranting the voiding of such election and the ordering of a supervised election under 29 U.S.C. § 482(c).[3] For purposes of the Secretary's summary judgment motion, the court must next consider whether there exists a genuine issue of material fact as to the possibility of the IOMM & P adducing sufficient evidence to meet its burden of showing by a preponderance of the evidence that such violation did not affect the election. The court finds that there can be adduced in this case no tangible evidence sufficient to meet defendant union's burden and accordingly grants plaintiff's motion for summary judgment.
The court bases this conclusion on the following uncontested facts: On August 19, 1971, the IOMM & P mailed to each of its members the Newsletter which this court finds to be violative of 29 U.S.C. § 481. On September 21, 1971, the American Arbitration Association ("AAA"), which the IOMM & P had selected as its impartial balloting agency to conduct the union's 1971 election, mailed ballots for said election to the members of the IOMM & P. In this election, International President O'Callaghan ran as part of a team, which included International Executive Vice-President Caldwell, International Secretary-Treasurer Lowen, and all incumbent port officers. He was opposed by Lloyd W. Sheldon, who was part of a team running for the International offices and associated with an organization of IOMM & P members known as Members for a Democratic Union, which also supported candidates for port offices. There was in addition a third slate of candidates running for the International offices. On September 16, 1971, Lloyd Sheldon and two other candidates associated with him brought the action before Judge Croake, described above, against the IOMM & P's incumbent International officers. On November 4, 1971, Judge Croake ordered the IOMM & P to publish and distribute campaign literature submitted by Sheldon and his co-plaintiffs "in a manner similar to the publication and distribution given the newsletter . . ." Pursuant to Judge Croake's order, Sheldon submitted literature to the AAA sometime after Judge Croake's order and shortly before November 9, 1971. The AAA mailed Sheldon's literature shortly after November 9, 1971, and by that time 3,000 to 4,000 ballots had been cast and returned. All ballots were required to be received by December 21, 1971, and when the ballots were actually counted on December 22, 1971, all those on *1230 the O'Callaghan team, with the exception of one minor candidate (J. Haring, who was running for Assistant Port Agent of Wilmington), either won outright or won a sufficient number of votes to enter a run-off.
Given this framework of facts, it would be impossible for defendant union to produce tangible evidence sufficient to overcome the prima facie case that the Newsletter may have influenced the election. Even assuming that the November 9th mailing purged all subsequent voting of the discriminative effects of the Newsletter (which is not a valid assumption at least as regards the third slate of International candidates opposing both O'Callaghan and Sheldon, which never was afforded a union-financed mailing), the voting which took place before November 9 was clearly of such magnitude that the results of the entire election could have hinged on the effect of the Newsletter on this pre-remedy balloting. This fact is dramatically demonstrated by the affidavit and accompanying chart annexed as Exhibit EE to plaintiff's 9(g) statement. In that affidavit, Brian P. O'Hanlon, Compliance Officer with the New York-Area Office, Labor Management Services Administration, states that upon examining the ballot envelopes from the election he is able to determine how many members within each Port of the Offshore Division had voted by certain specific dates. The accompanying chart shows that in every Port there had been ballots cast by November 9, 1971 potentially sufficient to have changed the result in all contests of the disputed election.[4] While defendant union, in its response to plaintiff's 9(g) statement, makes no claim that these computations are incorrect, it does deny them on the ground that it "has no knowledge of the source of such document nor does it admit to the statements therein." This allegation is clearly inadequate to raise a genuine issue of material fact regarding this matter. The affidavit in question explicitly outlines the documents from which its conclusions are derived, and furthermore notes that "[a]ll the documents mentioned herein are available to the parties and the court for inspection." Under these circumstances, the mere fact that defendant has failed to examine and analyze these sources does not suffice to raise a genuine issue of material fact.
The major argument which defendant puts forward to meet its burden of showing that the Newsletter did not influence the voting is the fact that some members of the O'Callaghan team won by greater margins than did O'Callaghan himself. The union claims that this rebuts the prima facie case that the Newsletter may have influenced the votes for his teammates. The court does not comprehend this argument. All that need be shown is that the Newsletter may have influenced the votes cast. Just because O'Callaghan barely avoided the necessity of a runoff in 1971 while others in his team had greater success in the polling does not mean that those who voted for the others were not influenced at all by the Newsletter.
In short, it is clear to this court that there exists no tangible evidence by which defendant can show that the Newsletter did not influence the 1971 election. There is no conceivable way in which defendant can confront and overcome the imponderables inherent in analyzing the decisions made by each elector in 1971 in choosing to vote or not to vote and in selecting the particular candidate for whom to vote in each of the various contests on the ballot.
Accordingly, this court sees fit to grant plaintiff's motion for summary judgment, declaring the 1971 election of officers conducted by the defendant void and ordering a new election under the supervision of the Secretary of Labor. In so doing, the court does not feel it necessary to consider the additional four violations alleged by the Secretary as the basis for his summary judgment motion, since the Newsletter violation, *1231 upon which the motion is hereby granted, comprehends all of the contests in the election which are involved in the additional alleged violations, and any decision regarding such violations would not affect the ultimate disposition of the case.
Within five days of receipt of this opinion, submit order on notice.
SO ORDERED.
NOTES
[1] This 1974 election included a run-off election which actually transpired in 1975.
[2] The Secretary of Labor has instituted an action before this court, 75 Civ. 2095, contesting certain aspects of the 1974 election. That action will become moot as a result of the supervised election conducted pursuant to the granting of summary judgment for plaintiff in the instant action.

It should also be noted that in the case styled Sheldon v. O'Callaghan, 497 F.2d 1276 (2d Cir. 1974), cert. denied 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974), affirmed from the bench by 2d Cir. on second appeal, February 26, 1976, it has been held that the 1970 constitution of the IOMM & P, under which the 1971 election was conducted, was adopted improperly in that dissident views on the adoption of that constitution were not properly disseminated by the union officers. An elaborate remedial procedure formulated by District Judge Knapp and affirmed by the Second Circuit does not void the 1970 constitution, but merely establishes a lengthy procedure whereby the union must take action to allow the membership to reconsider and vote upon it. Were the 1970 constitution to be discarded, which is not at all a certainty, yet another election would perhaps be mandated. Yet this possibility is far too tenuous to prevent this court from remedying the violations which it finds to have occurred in the matter duly before it.
[3] See p. 14 supra.
[4] The relevant number of ballots which potentially could change the result of an election is one-half of the margin of victory plus one.