**Raymond J. DONOVAN, Secretary of Labor, Plaintiff,**

v.

**LOCAL 719, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, Defendant.**

**No. 80 C 6440.**

United States District Court, N.D. Illinois, E.D.

Oct. 21, 1982.

Opinion on Motion to Vacate Judgment Dec. 2, 1982.

Dan K. Webb, U.S. Atty., Edward J. Moran, Asst. U.S. Atty., Janet Graney, Atty., U.S. Dept. of Labor, Chicago, Ill., for plaintiff.

Irving M. Friedman, Michael B. Erp, Ann C. Hodges, Katz, Friedman, Schur & Eagle, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

This action was brought by Raymond Donovan, Secretary of Labor, pursuant to Title IV of the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"). In the complaint, plaintiff alleges that, during the course of its May, 1980 election of officers, defendant union, Local 719 of the UAW, violated Section 401(g) of the LMRDA, 29 U.S.C. § 481(g). Accordingly, plaintiff asks that this court void the 1980 election of officers and order a new election subject to the supervision of the Secretary of Labor.

This matter is before the court on cross motions of the parties. Defendant union has moved to bifurcate the issues presented, namely, whether defendant violated section 401(g) of the LMRDA, and whether that violation may have affected the outcome of the election. Plaintiff is opposed to bifurcation and has further moved for summary judgment.

The facts upon which the Secretary bases his complaint can be briefly summarized. At the time of the election in question, Local 719 represented approximately 10,000 employees of the Electro-Motive Division of General Motors Corporation at two plants located in Chicago and LaGrange, Illinois. On May 4, 1980, defendant conducted nominations of candidates for various union offices.[1] On May 8, the company delivered to the union offices copies of the contract which had been negotiated and ratified by the union in October, 1979. This contract was supplemental to the national collective bargaining agreement as it governed wages, health and safety factors, shift changes and other matters specific to the Chicago and LaGrange plants. Copies of the supplemental agreement were distributed to union members at all plant gates on May 8.

On May 10 or 11, members of the "United Locomotive Workers" caucus ("ULW"), a group opposing the incumbent slate of candidates, the "Solidarity With New Interested 719" caucus, distributed a leaflet to union members alleging that the supplemental agreement did not include many rights the workers were told had been incorporated into the agreement. On or about May 12, George Dakuras, Chairman of defendant's shop committee, prepared a reply to this leaflet. This reply was approved by Larry Espinosa, the incumbent president and candidate for re-election to that office. The reply consisted of a one page leaflet: on one side was a copy of the material distributed by the ULW slate with the word "LIES" stamped on each paragraph, and on the other side was a written response signed by Dakuras and Espinosa and a letter from an employer representative. The May 12 reply was printed by union person-

---

1. Nominations were conducted for the following offices: President, First and Second Vice-President, Recording Secretary, Financial Secretary-Treasurer, Sergeant-at-Arms, Guide, Trustee (3), Member-at-Large (2) for each plant, Shop Committee Chairman, Shop Committeemen for Plant # 1 (Days-4), (Nights-2), and Shop Committeemen for Plant # 2 (Days and Nights).

nel with union equipment and paper, and 10,000 copies were distributed at all gates to the two plants on May 12–14. On May 20–22, the election took place and the ULW caucus did not win any positions.

Title IV of the LMRDA is designed to insure "free and democratic" union elections through a set of substantive and procedural rules. *Wirtz v. Local 153, Glass Bottle Blower's Association,* 389 U.S. 463, 470, 88 S.Ct. 643, 647, 19 L.Ed.2d 705 (1968). The specific provision of Title IV at issue here is Section 401(g), 29 U.S.C. § 481(g), which provides as follows:

> "(g) No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this title. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election."

■ The language of Section 401(g) is thus clear and unambiguous. It provides that "no moneys" received by a union can be expended to promote the candidacy of any individual in a union election. *Shultz v. Local 6799, United Steelworkers of America,* 426 F.2d 969, 972 (9th Cir.1970), aff'd on other grounds, 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971). Section 401(g) also prohibits the use of union facilities equipment and materials in support of any candidacy.[2] Moreover, the fact that an expenditure is "de minimis" does not make it any less a violation.

■ Section 401(g) thus proscribes the showing of any preference for any candi-

date for union office through a union-financed publication.[3] Expenditures for factual notices or statements of interest to the membership, however, are permitted. It is indeed often a fine line when the coverage of newsworthy activities of an incumbent official by a union publication becomes so excessive so as to "render it campaign literature on behalf of the incumbent." *Camarata v. International Brotherhood of Teamsters,* 478 F.Supp. 321, 330 (D.D.C.1979). *See also Yablonski v. United Mine Workers of America,* 305 F.Supp. 868, 871 (D.D.C. 1969).

In determining upon which side of the line a union publication falls, courts have prohibited not only explicit references to candidates but also more subtle means of support. For example, in *Brennan v. Sindicato Empleados de Equipo Pesado, Construccion Y Ramas Anexas de Puerto Rico, Inc.,* 370 F.Supp. 872 (D.P.R.1974), union funds were used to distribute handbills accusing the incumbent president's opponent of repeatedly lying about expenditures of union funds. While the union also engaged in much more blatant political activities, the court found that the handbills alone would constitute a violation of Section 401(g), for their overall tone and content was to endorse and encourage the re-election of the incumbent. *Id.* at 878–79. *See also Usery v. International Organization of Masters, Mates and Pilots,* 538 F.2d 946 (2d Cir.1976); *Hodgson v. United Mine Workers of America,* 344 F.Supp. 17 (D.D.C.1972).

■ Good intentions on the part of the defendant union are not sufficient to defeat an alleged violation of Section 401(g). The Eighth Circuit, in *Usery v. Stove, Furnace and Allied Appliance Workers,* 547 F.2d

---

**2.** Section 452.76 of the Interpretive Regulations Governing Union Elections, promulgated by the Secretary of Labor, provides: "[O]fficers and employees may not . . . use union funds, facilities, equipment, stationary, etc., to assist them in . . . campaigning." 29 CFR 452.76.

The court recognizes that Congress did not delegate any rulemaking authority to the Secretary of Labor, and that these regulations are therefore merely "interpretive." But while they are not necessarily binding on the court, they are entitled to consideration. *Alvey v.*

*General Electric Co.,* 622 F.2d 1279, 1286 n. 7 (7th Cir.1980).

**3.** Department of Labor Interpretive Regulation 452.75 provides: "[A] union may neither attack a candidate in a union-financed publication nor urge the nomination or election of a candidate in a union-financed letter to the members. Any such expenditure regardless of the amount, constitutes a violation of section 401(g)." 29 CFR 452.75.

1043, 1045 (8th Cir.1977), found a violation of Section 401(g) when a retiring union president endorsed several candidates in the union's "Officers Report," even though it was also found that he acted from the "best of motives." Congress designed Title IV "to curb the possibility of abuse by benevolent as well as malevolent entrenched leaderships." *Id.* (*Quoting Wirtz v. Hotel, Motel & Club Employees Union,* 391 U.S. 492, 503, 88 S.Ct. 1743, 1750, 20 L.Ed.2d 763 (1968).) *See also Sindicato Empleados, supra,* 370 F.Supp. at 878–79.

Thus, in determining whether there has been impermissible campaign usage of a union publication, the court must consider both direct and indirect references to candidates. To establish a violation of Section 401(g), it is not necessary that the questioned publication be totally or exclusively committed to endorsing specific candidates or attacking the opposition. Rather, its overall tone, timing and content must be evaluated to determine whether there is any blatant or subtle encouragement of the incumbents.

A review of the undisputed facts in the instant case points unequivocally to a finding that the leaflet distributed by defendant on May 12 constitutes prohibited campaign literature. While the union's leaflet did indicate that there were typographical errors in the contracts distributed May 8, it went beyond a purely factual statement involving union business. Defendant's leaflet consisted on one side of a copy of the ULW literature stamped with the word "LIES" on each paragraph; on the other side was a statement signed by Espinosa, the incumbent president, ending with "[W]e would like to point out that we feel it is wrong for the members to lie to you for their own political gain . . . ." The stamping of "LIES" on each paragraph is certainly an attack on the credibility of the ULW caucus. Moreover, the above-quoted statement must be interpreted as a reference to the union election which was to take place a mere eight days after distribution of defendant's leaflet. Defendant's use of union funds and facilities to attack the opposi-

tion slate of candidates, thereby enhancing its own prospects for victory, is expressly prohibited by the LMRDA.

Defendant contends that the leaflet distributed on May 12 is not campaign literature, arguing that there was never any discussion of the campaign or the candidates in the decision to circulate a response to the ULW leaflet. This contention, however, is plainly untenable. The Supreme Court, in *Hotel, Motel & Club Employees Union,* 391 U.S. at 503, 88 S.Ct. at 1750, has stated that, under the LMRDA, the intent of union officials is immaterial. While Dakuras and Espinosa may have had some legitimate purpose in deciding to circulate a response to the ULW leaflet, taken as a whole the leaflet enhanced the candidacy of the incumbent slate and encouraged their re-election. Furthermore, the union leadership had several far less politically oriented means of responding to the challengers' leaflet. They could have simply printed corrected versions of the agreement, or, if these would not have been available, simply advised the membership that the copy of the agreement circulated by the ULW caucus was not a true copy. Instead, defendant produced and distributed materials which clearly constitute prohibited campaign literature.

Defendant also contends that bad faith on the part of the complaining party vitiates any objection that party might have to the election. Specifically, defendant argues that the ULW caucus, knowing the omissions in the contract stemmed solely from typographical errors, distributed a leaflet falsely attacking the incumbents for selling out the membership. The ULW caucus, continues the argument, thus essentially tricked defendant into issuing a response which would violate Section 401(g).

In support of its contention, defendant relies on *Marshall v. Local 1010, United Steelworkers of America,* 664 F.2d 144 (7th Cir.1981). *Local 1010* involved an alleged violation of the secrecy provisions of the LMRDA, as the incumbent faction had limited the number of voting booths, thereby forcing members to vote at tables out in the

open. The complainant, an unsuccessful candidate on the incumbent slate, protested the election. The Seventh Circuit found that the LMRDA does not require a court to order a new election when the incumbent group intentionally violates the Act, loses the election and then attempts to rely on its own violations to invalidate the election. A new election, said the court, would simply encourage deliberate violations of the Act. *Id.* at 151–52.

Defendant's reliance on *Local 1010* is plainly inapposite. The court there was concerned with allowing the incumbent union to use the Secretary of Labor as a tool in order to "torpedo" the election and gain a second chance at maintaining their entrenched position. The court recognized that Congress, through Title IV, was interested in curbing abuse by entrenched union leadership and encouraging challenges to such leadership. *Id.* at 151. In the instant case, the ULW caucus was not an incumbent group and certainly had no entrenched position to seek to maintain. Rather, it sought to challenge the incumbent leadership through the distribution of campaign literature.

The distribution of 10,000 copies of the May 12 leaflet, then, through the use of union funds and facilities, is a clear violation of Section 401(g). This in itself does not require a new election, however, since the statute requires an additional finding that such violation "may have affected the outcome of the election." In *Hotel, Motel & Club Employees Union,* 391 U.S. at 505–09, 88 S.Ct. at 1751–1753, the Supreme Court considered the burden of proof which should be applied in determining whether or not this finding can be made. The Court stated that a proven violation of Section 401(g) establishes a *prima facie* case that the outcome of the election "may have" been "affected." The *prima facie* case established by the Secretary can be met by evidence which supports a finding that the

violation did not affect the result. Such a finding, however, may not rest on conjecture but only on "tangible evidence against the reasonable possibility that the . . . [violation] did affect the outcome." *Id.* at 508, 88 S.Ct. at 1752.[4]

Thus, once a Section 401 violation has been demonstrated, a very substantial burden falls upon a defendant union. In *Hotel, Motel & Club Employees Union,* 391 U.S. at 509, 88 S.Ct. at 1753, for example, the Court examined a union candidacy qualification which effectively denied several members of the opposition party the right to be candidates in an upcoming election. The District Court cited the substantial defeat of the opposition candidates who did run, the lack of evidence that any of the disqualified nominees was a proven votegetter and the lack of a substantial grievance or issue asserted by the opposition party in concluding that their disqualification could not have affected the election's outcome. The Court rejected this analysis, holding that there could be no tangible evidence of the effect of the exclusion on the election. *See also Hodgson v. Liquor Salesman's Union, Local No. 2,* 334 F.Supp. 1366, 1368, 1378 (S.D.N.Y.1971).

In the instant case, it is undisputed that 10,000 copies of the May 12 reply were produced and distributed at all plant gates for three successive days. This distribution took place approximately one week prior to the election. The margin of victory for the various offices ranged from 369 to 1940 votes. The logical inference from this sequence of events is that most, if not all, of the union's 10,000 members saw or heard about the May 12 reply. While it is impossible to determine the precise number of members affected by these events, proof of that fact is not required under the Supreme Court's mandate in *Hotel, Motel & Club Employees Union.* The Secretary need only show that the union's violation of Section

---

**4.** For example, in *Hodgson v. Local 734, International Brotherhood of Teamsters,* 336 F.Supp. 1243, 1255 (N.D.Ill.1972), Judge Will hypothesized a situation where the Secretary's allegations were limited to a claim that twenty voters voted twice and the defendant could affirmatively prove that the election winners won by 2000 votes. In such a case, the union could easily demonstrate that its violation did not affect the outcome of the election.

401(g) may have affected the outcome of the election of May 20–22. That burden has been met.

Defendant's arguments that any violation which might have occurred did not affect the outcome of the election bear a striking similarity to those relied upon by the district court in *Hotel, Motel & Club Employees Union.* Specifically, defendant contends that the substantial defeat of the ULW caucus not only in the May, 1980 election but also in previous elections indicated the lack of effect of the leaflet in question. This argument, however, was rejected, by the Supreme Court as pure conjecture, falling short of the "tangible evidence" necessary to rebut the "reasonable possibility" of an effect on the election.

Defendant has also submitted affidavits of twelve union members stating that they saw the May 12 leaflet issued by Espinosa and Dakuras and that it did not affect how they voted in the election. While these statements may raise some doubt as to the effect of the violation, this court finds that they are not sufficient to rebut the Secretary's *prima facie* case that the secret ballot "may have" affected the outcome of the election.

Summary judgment is appropriate only if it appears that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). Upon a review of the facts presented, this court finds that the defendant union has failed to adduce any evidence to support a finding that the leaflet distributed on May 12, 1980, does not constitute campaign literature in violation of Section 401(g). Furthermore, while the leaflet's actual effect on the outcome of the election is of course impossible to determine, proof of that fact is not required. The question in this motion is whether there exists a genuine issue as to the possibility of the defendant union producing sufficient evidence to meet its burden of showing, by a preponderance of the evidence, that its violation of the Act did not affect the outcome of the election. The court finds that no tangible evidence can be adduced to meet defendant's substantial burden.

Accordingly, plaintiff's motion for summary judgment is granted and defendant's motion for bifurcation is denied as moot. The May, 1980, election of officers conducted by defendant is hereby declared null and void and a new election is ordered for all officers, except the office of First Vice-President,[5] under the supervision of the Secretary of Labor.

### On Motion To Vacate Judgment

This action was brought by Raymond Donovan, Secretary of Labor, pursuant to Title IV of the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"). On October 21, 1982, this court issued a memorandum opinion and order granting the Secretary's motion for summary judgment. The court held that the defendant union, Local 719 of the UAW, violated section 401(g) of the LMRDA, 29 U.S.C. § 481(g), by expending union funds in support of the incumbent slate of officers, led by Larry Espinosa. The court also held that this violation "may have affected the outcome" of the election held on May 20–22, 1980. Accordingly, this election was declared null and void, and a new election was ordered for all offices, except that of First Vice-President.[1] *Donovan v. Local 719, United Automobile Workers,* 561 F.Supp. 54 (N.D.Ill.1982).

The defendant union has now moved to vacate the judgment entered by this court on the second issue noted above, namely, the effect of the violation on the outcome of the election. Its first argument in support of this motion is that the case at bar is distinguishable from *Wirtz v. Hotel, Motel & Club Employees Union,* 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968), a decision relied on by the court in the October 21

---

5. The Secretary did not include this office in his prayer for relief, as the office of First Vice-President was uncontested.

1. The Secretary did not include this office in his prayer for relief, as the office of First Vice-President was uncontested.

decision. In *Hotel, Motel & Club Employees Union,* the Supreme Court held that a proven violation of section 401(g) establishes a *prima facie* case that the outcome of the election "may have" been "affected." The burden then falls on the union to adduce "tangible evidence against the reasonable possibility that the ... [violation] did affect the outcome." 391 U.S. at 508, 88 S.Ct. at 1752. *See also Local 719,* at 59. The Court concluded that this burden was not met in the case before it: several candidates had been excluded from the ballot, rendering it impossible to determine the effect of such exclusion on the election. Local 719 now argues that the instant case is distinguishable on the ground that all eligible candidates participated in the May 20–22 election, and that it will therefore be able to produce tangible evidence that the campaign literature distributed to union members did not affect the outcome of the election.

The court does not read *Hotel, Motel & Club Employees Union* in the narrow and limited manner advanced by defendant. It is true, of course, that the Supreme Court did address the exclusion of candidates from the ballot, while the case at bar involves prohibited campaign literature. But the Court's seminal ruling cannot be limited to the specific facts presented before it; indeed, the Court's initial analysis underscored the overall goals of the LMRDA to promote union democracy and deter corruption:

"A pervasive theme in the congressional debates about the election provisions was that revelations of corruption, dictatorial practices and racketeering in some unions investigated by Congress indicated a need to protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government, and, through the election process, to keep the union leadership responsive to the membership."

*Hotel, Motel & Club Employees Union,* 391 U.S. at 497, 88 S.Ct. at 1746 (footnote omitted).

Moreover, decisions subsequent to *Hotel, Motel & Club Employees Union* have not restricted the Court's analysis to the exclusion of candidates from the ballot. In fact, several cases have arisen in precisely the same context as that presented here, namely, the distribution of prohibited campaign literature. For example, in *Usery v. International Organization of Masters, Mates and Pilots,* 422 F.Supp. 1221 (S.D.N.Y.), *modified on other grounds,* 538 F.2d 946 (2d Cir.1976), the court examined the effect of certain newsletters mailed to all union members. According to the Secretary of Labor, these newsletters contained campaign statements vilifying the opposition slate of candidates and praising the incumbents. After 3000 to 4000 ballots had been cast, an action was brought by the opposition slate and it was ordered that these opposition candidates be afforded similar publication opportunities. In a subsequent action pursuant to section 401(g), the district court found that despite this second mailing, "it would be impossible for defendant union to produce tangible evidence sufficient to overcome the *prima facie* case that the Newsletter may have influenced the election." *Masters, Mates and Pilots,* 422 F.Supp. at 1230. The court reiterated that all the Secretary need demonstrate is that the newsletter "*may* have influenced the votes cast." *Id.* (emphasis in original). In granting summary judgment for the Secretary on this issue, the court stated, in language highly relevant to the case at bar:

"In short, it is clear to this court that there exists no tangible evidence by which defendant can show that the Newsletter did not influence the 1971 election. *There is no conceivable way* in which defendant can confront and overcome the imponderables inherent in analyzing the decisions made by each elector in 1971 in choosing to vote or not to vote and in selecting the particular candidate for whom to vote in each of the various contests on the ballot." *Id.* (emphasis supplied).

Further support for the conclusion that the analysis set forth in *Hotel, Motel & Club Employees Union* is not limited to

cases involving the exclusion of candidates from the ballot is found in *Hodgson v. Liquor Salesman's Union, Local No. 2,* 334 F.Supp. 1369 (S.D.N.Y.), *aff'd,* 444 F.2d 1344 (2d Cir.1971). There the Secretary of Labor brought suit to set aside a union election held on January 9, 1970. The principal basis for the action was the use of union funds to publish the December, 1969 and January, 1970, issues of the union newsletter. Both issues severely criticized the insurgent slate of candidates and praised the incumbent president, and both were apparently received by all 1600 union members prior to the election. The election tally revealed a margin of victory for the incumbents ranging from six to 86 votes. *Liquor Salesman's Union, Local No. 2,* 334 F.Supp. at 1371–78. The court held that the union's activities violated section 401(g) of the LMRDA, and that no tangible evidence was available of the effect of that violation. *Id.* at 1378.

The court remains convinced that the standard set forth in *Hotel, Motel & Club Employees Union* is applicable to the case at bar. The October 21 decision of this court is not only consistent with that standard, but mandated by it.

Defendant also cites a recent ruling by the National Labor Relations Board ("the Board") in support of its motion to vacate. In *Midland National Life Insurance Co.,* 263 NLRB No. 24 (1982), the employer allegedly misrepresented to its employees that a strike called by the union led directly to the closing of a large local employer and that the union had bargained extensively with two other local employers without success. The employer also allegedly engaged in other fraudulent activities. Rejecting the conclusion of the Hearing Examiner that these misrepresentations interfered with the employees' exercise of their voting rights, three members of the Board concluded:

> "[W]e rule today that we will no longer probe into the truth or falsity of the parties' campaign statements, and that we will not set elections aside on the basis of misleading campaign statements."

*Midland,* 263 NLRB No. 24, at 21. In reaching this conclusion, the members relied on a prior ruling in *Shopping Kart Food Market, Inc.,* 228 NLRB No. 1311, 1313 (1977), where the Board stated that employees are "mature individuals who are capable of recognizing campaign propaganda for what it is and discounting it." *Midland,* 263 NLRB No. 24, at 19.

The court does not find the *Midland* ruling to be persuasive authority. First, the case arose in the context of selecting a bargaining representative, and it was the employer who engaged in the allegedly fraudulent and misleading activities. In contrast, the case at bar involves the election of union officers, and it is the incumbent officers who engaged in the questionable activities. Even assuming, *arguendo,* that the ruling of the three Board members applies to the facts presented herein, it bears little weight with the court. As noted by dissenting members Fanning and Jenkins:

> "For the second time in 5 years, a bare majority of the Board has abandoned the flexible and balanced ... standard for determining when election campaign misrepresentations have overstepped the bounds of tolerability and substituted an ultra-permissive standard that places a premium on the well-timed use of deception, trickery, and fraud .... [T]he majority [has] create[d] an irrebuttable presumption that employees can recognize all misrepresentations, however opaque and deceptive, ... Employers' free choice in elections, the only reason we run elections, must necessarily be inhibited, distorted, and frustrated by this new rule.

*Midland,* 263 NLRB No. 24, at 24, 27. Fanning and Jenkins indicate that the majority opinion represents the Board's most recent ruling in an area characterized by seemingly incessant shifts in position. *Id.* at 24–26. *Midland* is thus simply the latest in a sequence of rulings involving campaign literature and, even assuming it applies to the case at bar, the court does not find it persuasive.

Defendant's final contention is that if the October 21 decision is vacated and a hearing conducted, it could produce testimony from both expert witnesses and union members who received the campaign leaflets to the effect that the literature did not affect the outcome of the election. The union, however, has misinterpreted the standards by which a case such as this is to be judged. It is not the duty of this court to engage in the arithmetical exercise of tallying the precise number of union members whose vote was affected by the leaflets and those whose votes were not so affected. Under the Supreme Court's ruling in *Hotel, Motel & Club Employees Union,* such an evaluation is not required.[2] This is not to say that a union is never to be allowed the opportunity to adduce tangible evidence to rebut the *prima facie* case established by the Secretary. As noted in the October 21 decision of this court, if, for example, the Secretary's claim is simply that 20 union members voted twice and the union contends that the winners' margin of victory was 2000 votes, the union could easily demonstrate that its violation did not affect the outcome of the election. *Local 719,* at 59 n. 4.

The type of claim hypothesized above is not presented here. Instead, the court is presented with the undisputed fact that, one week prior to the election, the defendant union produced and distributed at all plant gates 10,000 copies of the leaflet found to have violated section 401(g) of the LMRDA. The margin of victory for the various union offices ranged from 369 to 1940 votes. These numbers leave no doubt that the distribution was of such magnitude that the results of the election could have hinged on the effect of the leaflets. Application of the principles articulated by the Supreme Court in *Hotel, Motel & Club Employees Union* require this court to find that the violation affected the outcome of the election in a manner sufficient to warrant its invalidation.

2.  Permitting union members to parade before the court and testify as to the effect of certain leaflets distributed and read over 2½ years ago would also certainly require analysis of the

For the reasons stated above, defendant's motion to vacate the decision entered by this court on October 21, 1982, is denied.

"imponderables" to which Judge Motley referred and an evaluation of the type she cautioned against in *Master, Mates & Pilots, supra.*