William E. BROCK, Secretary of Labor

v.

The CONNECTICUT UNION OF TELEPHONE WORKERS, INC., Local 400, Telecommunications International Union.

Civ. No. N–85–169 (JAC).

United States District Court,
D. Connecticut.

March 28, 1988.

John B. Hughes, Office of U.S. Atty., New Haven, Conn., for plaintiff.

Paul M. Levinson, Mayer, Weiner & Levinson, New York City, for defendants.

RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, District Judge:

The Secretary of Labor ("Secretary" or "plaintiff") commenced this action under Title IV of the Labor–Management Reporting and Disclosure Act of 1959 (the "Act"),

29 U.S.C. § 401, *et seq.* The former president of the Connecticut Union of Telephone Workers, Inc. ("CUTW"), Local 400 of the Telecommunications International Union ("TIU") filed a complaint with the Secretary of Labor, alleging that moneys received by labor organizations by way of dues, assessments, or similar levies were used to promote a candidate for the office of President of CUTW and that this alleged violation may have affected the outcome of the mail ballot election completed on November 30, 1984, in violation of 29 U.S.C. § 481(g). Upon investigation of the complaint, the Secretary found probable cause to believe that a violation of the Act had occurred and thus instituted this suit on April 19, 1985.

The parties originally filed cross-motions for summary judgment in January and February of 1986. On July 25, 1986, the court denied both motions for summary judgment for failure to comply with District of Connecticut Local Rule 9(c), which requires each party to file a separate statement of material facts not in dispute in conjunction with a motion for summary judgment. For several months, the parties tried without success to resolve their dispute.

In March, 1987, the parties filed renewed cross-motions for summary judgment, supported by a joint stipulation of material facts not in dispute. The Secretary of Labor asks the court to declare the defendant's November 30, 1984 election for the office of President null and void and to direct the defendant to conduct a new election for the office of President under the supervision of the Department of Labor. For the reasons set forth below, the plaintiff's motion for summary judgment is GRANTED, and the defendant's motion for summary judgment is DENIED.

### I. *Background*

Summary judgment may be granted when there are no genuine issues as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of any material factual issue genuinely in

dispute. *See American International Group, Inc. v. London American International Corp., Ltd.,* 664 F.2d 348, 351 (2d Cir.1981). A court must resolve ambiguities and draw reasonable inferences against the moving party. *Id.* This inquiry is not changed when cross-motions are before the court. "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Board of Education,* 667 F.2d 305, 314 (2d Cir.1981).

The existence of a disputed fact will not prevent the granting of a motion for summary judgment unless the disputed fact is material. *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.,* 769 F.2d 919, 923 (2d Cir.1985). Moreover, a party is not permitted to create his own "genuine" issue of fact simply by presenting contradictory or unsupported statements. *See Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *S.E.C. v. Research Automation Corp.,* 585 F.2d 31, 33–34 (2d Cir.1978). Neither party has demonstrated the existence of any disputed facts which are material; accordingly, summary judgment is appropriate in this case.

The following are the material facts as set forth by the parties in their briefs, affidavits, exhibits, and the stipulation of material facts not in dispute filed pursuant to Local Rule 9(c). In November 1984, CUTW was an affiliated local union of the TIU, and thus was also known as Local 400 of the TIU. During November 1984, CUTW conducted its triennial election of officers by mail ballot. The ballots were mailed to the CUTW membership on November 14, 1984 and were to be returned no later than November 30, 1984. George Sherwood opposed John Shaughnessy for the office of President. At the time of the election, Shaughnessy was the incumbent President of CUTW. He had been President of CUTW for approximately 26 years. Shaughnessy was also the President of TIU and had been for over 20 years.

During the two-year period preceding the November 1984 election, the issue of possi-

ble TIU affiliation with an AFL–CIO affiliated international union was the subject of considerable debate and controversy among CUTW and other TIU members. *See* Stipulated Statement of Facts Not in Dispute (filed March 3, 1987) ("Stipulated Facts") at ¶ 4 (citing *Amirault v. Shaughnessy*, Civil No. H 84–113, Memorandum of Decision (D.Conn. July 20, 1984), *rev'd on other grounds*, 749 F.2d 140 (2d Cir.1984)). Shaughnessy, as President of both the TIU and CUTW, was the moving force behind the effort to affiliate the TIU with the American Federation of State, County and Municipal Employees ("AFSCME"). However, other member locals within the TIU supported affiliation with either the Communication Workers of America ("CWA") or the International Brotherhood of Electrical Workers ("IBEW"). At the time of the November 1984 CUTW election, affiliation was a major, unresolved issue within the TIU. *See* Stipulated Facts at ¶ 11.

Both the CWA and IBEW conducted spirited campaigns to discredit the merits of TIU affiliation with AFCSME and simultaneously to muster support within the TIU for affiliation with their respective unions. Eventually, particular individuals became identified with opposing factions on the affiliation issue. *See id.* at ¶ 8. For example, Vincent Messina, President of the Union of Telephone Workers ("UTW"), located in New York City, was strongly opposed to TIU affiliation with AFSCME and actively supported affiliation with CWA by mailing literature to TIU members. Shaughnessy, on the other hand, was identified as the major proponent of affiliation with AFSCME. *See id.* ¶¶ 9–10.

During the period of November 14 to November 30, 1984, two pieces of literature were mailed to certain CUTW members. The first piece, referred to by the parties as the "Messina Letter," was drafted by UTW President Vincent Messina on November 15, 1984. *See id.* ¶¶ 13, 26–30. Messina wrote the letter in an effort to correct statement that Shaughnessy had made at a recent meeting with UTW members held in Syracuse, New York. *See id.* at ¶ 28. At one time, UTW, like CUTW, had been affiliated with TIU. Shaughnes-

sy's alleged misstatements concerned the relationship between TIU's financial difficulties and UTW's non-payment of back TIU assessments. At the Syracuse meeting, Shaughnessy also discussed TIU's proposed affiliation with AFSCME. *See id.*

Messina sent a copy of the letter to Larry Cohen, a CWA organizer with offices in New Jersey, New York and Connecticut, who was involved in CWA's campaign to thwart TIU's affiliation with AFSCME. *See id.* at ¶ 29. CWA clerical workers used a CWA photocopier to make 10 to 15 copies of the Messina Letter. These copies were sent to other CWA organizers so that they would be aware of the general thrust of the CWA campaign to affiliate the CWA with TIU. *See id.* at ¶¶ 29–35.

Thereafter Cohen distributed the letter to other CWA organizers, including Stephen Early, a CWA organizer with an office in Waltham, Massachusetts. In turn, Early sent approximately 100 copies of the letter to CUTW's local officers throughout Connecticut. At least one CUTW local President, Elizabeth Balsley of CUTW Local 206, received a copy of the Messina Letter at her home and discussed the letter with several other members of her CUTW local. Early copied the Messina Letter on a CWA photocopy machine. In addition, CWA union funds were used to pay the postage for the mailing of the copies of the Messina Letter to CUTW members. Both parties have stipulated that Early mailed the Messina Letter in conjunction with CWA's campaign against CUTW and AFSCME affiliation, and not *expressly* for the purpose of influencing CUTW's November 1984 election. *See id.* at ¶¶ 14, 35–41.

The second piece of literature was a flier prepared by unnamed members of the IBEW at their headquarters in Washington, D.C (the "IBEW Flier"). The purpose of the IBEW Flier was also to undermine John Shaughnessy's efforts to have the TIU affiliate with AFSCME. *See id.* at ¶¶ 15–16, 23–25. IBEW printed over 50,000 copies of the flier for distribution to TIU members across the country. *See id.* at ¶ 24. This flier was only one of many fliers which the IBEW prepared and distributed

in an effort to halt the proposed affiliation between TIU and AFSCME. *See id.* at ¶ 25. Approximately 6,000 copies of the flier were distributed by IBEW organizers to CUTW members during the period that the election ballots were mailed to CUTW members. *See id.* at ¶¶ 12, 23. IBEW funds were used to prepare and mail the IBEW Flier. *See id.* at ¶ 23.

Neither piece of literature specifically mentioned CUTW presidential candidate George Sherwood. Moreover, neither Sherwood nor any other CUTW executive board member solicited, encouraged, or aided either the CWA or IBEW in the distribution of their literature. Nevertheless, the court finds, in light of the undisputed facts, that no reasonable juror could conclude otherwise than that the probable impact of both pieces of literature was to discredit incumbent John Shaughnessy, the "major proponent" of TIU affiliation with AFSCME. *See id.* at 2, 5, 8, 10, 23; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2512–13, 91 L.Ed.2d 202 (1986). The parties have stipulated that during the two-year period preceding the November 1984 election, the issue of TIU affiliation with AFSCME was the subject of considerable debate and controversy, and that it remained a "major and unresolved issue .. at the time that CUTW conducted its election ..." *See* Stipulated Facts at ¶¶ 4, 11. Both CWA and IBEW conducted vigorous campaigns to discredit affiliation with AFSCME. *See id.* at ¶ 7. The purpose of the IBEW flier was to undermine Shaughnessy's efforts to have TIU affiliate with AFSCME. *See id.* at ¶ 23. As discussed below, both the Messina Letter and the IBEW Flier clearly called into question Shaughnessy's qualifications as union leader. *See* II., A., *infra.*

George Sherwood was elected President of CUTW as a result of the November 1984 mail ballot election. Since the election, Shaughnessy has taken a position with the management of Southern New England Telephone Company. He is no longer a member of CUTW and is ineligible to run for office should a new election be conducted. Moreover, since this action was filed, CUTW has completed its regularly sched-

uled triennial election in November 1987, in which George Sherwood was reelected President. *See* Stipulated Statement of Additional Fact Not in Dispute (filed Mar. 25, 1988). However, it is only alleged irregularities in the November 1984 election which are the subject of this action.

## II. *Discussion*

The plaintiff claims that the Messina Letter and the IBEW Flier were mailed to CUTW members in violation of section 401(g) of the Act, 29 U.S.C. § 481(g), and that, because these documents may have affected the outcome of the defendant's mail ballot election completed on November 30, 1984, the Court must order the defendant to hold a new election under the supervision of the Secretary of Labor pursuant to 29 U.S.C. § 482(c). Section 401(g) of the Act provides:

> No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this subchapter. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.

Plaintiff urges the court to construe 401(g) as prohibiting any labor organization subject to the provisions of the Act from using its funds received by way of dues, assessments or similar levy, to promote the candidacy of any person in an election, even if the election takes place in another unaffiliated union. *See* Memorandum of Law in Support of Plaintiff's Motion of Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment (filed February 25, 1986) at 7 (citing 29 C.F.R. § 452.73). Defendant, on the other hand, raises three arguments in its defense: (1) The Messina Letter and the IBEW Flier did not "promote the candidacy" of George Sherwood within the meaning of section 401(g); (2) Because neither the CUTW nor any of its officers or executive board members were involved in the distribution of the Messina Letter or the IBEW Flier, the

alleged violation of section 401(g) is not actionable; and (3) The action is moot because John Shaughnessy is no longer eligible to run for the office of President of CUTW. All of the defendant's arguments are without merit.

### A.

The defendant argues that the Messina Letter and the IBEW Flier did not "promote the candidacy" of George Sherwood because neither piece mentions either the election or Sherwood's name. *See* Memorandum of Law in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (filed January 30, 1986) ("Defendant's Memorandum of Law") at 8. Rather, the defendant claims that the publications constitute "factual statements of issues not involving candidates...." which are not prohibited by section 401(g). *Id.* at 9. Although there is no explicit stipulation on the subject, it is not disputed that almost any statement concerning TIU/AFSCME affiliation would be closely associated with Shaughnessy. *See* Stipulated Facts at ¶¶ 2, 5, 8, 10, 23. To support its argument, the defendant in effect claims that both pieces were mailed by CWA and IBEW solely to "encourage[ ] the free flow of information so that the TIU membership would be able to case an informed ballot on the affiliation issue." Defendant's Memorandum of Law at 8.

■ "To establish a violation of Section 401(g), it is not necessary that the questioned publication be explicitly or exclusively committed to endorsing specific candidates or attacking the opposition. Rather, its overall tone, timing and content must be evaluated to determine whether there is any blatant or subtle encouragement of the incumbents [or challengers]." *Donovan v. Local 719, United Automobile, Aerospace and Agricultural Implement Workers of America,* 561 F.Supp. 54, 58 (N.D.Ill.1982); *accord, Usery v. International Organization of Masters, Mates and Pilots,* 538 F.2d 946, 949 (2d Cir.1976); *Hodgson v. Liquor Salesmen's Union, Local No. 2,* 334 F.Supp. 1369, 1377 (S.D.N.Y.), *aff'd,* 444 F.2d 1344 (2d Cir.1971); *Wirtz v. Inde-*

*pendent Workers Union of Florida,* 272 F.Supp. 31, 33 (M.D.Fla.1967). The Messina Letter and the IBEW Flier both were distributed between November 15 and November 30, 1984, the exact time of balloting for the CUTW's election of officers. It is undisputed that Shaughnessy, the incumbent CUTW President, was the official most strongly associated with support for affiliation of TIU, and ultimately, its local, CUTW, with AFSCME. Moreover, it would be difficult to mistake the import and thrust of either the Messina Letter or the IBEW Flier.

The Messina Letter was written on November 15, 1984. In this letter, Messina writes:

Dear TIU Member:

It has come to my attention that TIU President John Shaughnessy has recently been misrepresenting the state of financial relations between the TIU and the Union of Telephone Worker (UTW).

TIU members have apparently been questioning President Shaughnessy about the rather large operating deficit revealed in the organization's recently released 1983 financial statement.

\* \* \* \* \* \*

President Shaughnessy ... has been claiming that TIU is not really in such bad financial shape because it will soon be collecting the $162,000 in per capita payments UTW has not sent the TIU over the last 13 months. According to Shaughnessy, a lawsuit has been filed to force payment of these "back dues" by our membership.

*Let me set the record straight on this for the benefit of all TIU members:*

*1. UTW stopped making per capita payments to the TIU because we weren't getting anything in return for our money!*

*2. No lawsuit has been filed against the UTW by TIU to collect this money....*

*3. With the money we saved by not sending $162,500 [sic] to TIU, UTW has been able to expand its steward training program, acquire new un-*

*ion offices, improve our publications, take more grievance cases to arbitration, and, generally, provide much better service to our 11,000 members.*

\* \* \* \* \* \*

Concerned members of the TIU, therefore, should not look to the UTW to help balance TIU's budget. *We have taken full control over our own financial affairs and will never again subsidize a national union that provides little or no services in return for the per capita payments it collects....*

Affidavit of John E. Flynn (filed January 30, 1986), Defendant's Exhibit 1 (emphasis in original).

The defendant has asserted that the letter quoted above was written solely "to set the record straight after Shaughnessy, at a meeting in Syracuse, New York, whose purpose it was to discuss with New York TIU members the AFSCME affiliation, made certain false statements concerning TIU finances." Defendant's Memorandum of Law at 10. The Syracuse meeting was held in late October or early November, 1984. *See* Affidavit of Vincent Messina (filed January 30, 1986) at 2. The CUTW election was held less than one month later. It may very well be that a primary purpose of the Messina Letter was to correct misinformation related by Shaughnessy. However, the Messina Letter does not simply correct financial facts; the document mailed in the midst of Shaughnessy's re-election bid and distributed to CUTW members, also discredits Shaughnessy personally by implying that he provided UTW with no services in return for its money in his position as leader of TIU. There is surely a line to be drawn between the (permissible) reporting of Shaughnessy's activities in his capacity as TIU President and an (impermissible) attack on him in the midst of an election as one who "misrepresents" facts and acts in ways which do not serve union membership. *Cf. Hodgson v. Liquor Salesmen's Union*, 334 F.Supp. at 1377. By using union funds to issue a letter which suggests the unsuitability of Shaughnessy as leader of the TIU, those distributing the Messina Letter used union

funds to distribute campaign literature in contravention of Section 401(g). *Cf. Wirtz v. Independent Workers Union of Florida*, 272 F.Supp. at 33.

Even more significantly a violation of section 401(g) is the IBEW Flier entitled "Shaughnessy & The Bell Busters." *See* Affidavit of John E. Flynn, Defendant's Exhibit 5. The IBEW Flier constitutes a clear attempt to influence adversely Shaughnessy's chances for re-election. In part the IBEW Flier states:

No, [Shaughnessy & The Bell Busters is] not a rock-and-roll band. Maybe we would be better off if it were. We've been waiting a long time for AFSCME and its TIU sycophants to come clean. Maybe they thought, if they ignored it long enough, it would go away. There can be no doubt about the facts. AFSCME is guilty! And Mr. Shaughnessy ... and all the other TIU officials who are pushing AFSCME ... know it!

Because we are a decent organization we wanted to give the TIU and its Bell Buster friends every opportunity to tell you themselves. So we waited—and waited—and waited some more. We can wait no longer. You deserve to know the TRUTH.

\* \* \* \* \* \*

The proof of the pudding is in the eating. Let's watch carefully to see what our TIU leaders do now. Will they repudiate the Bell Busters? Or will they confirm by their actions that they've been in bed together all along??

Remember when we were writing letters, sending telegrams, and phoning our Congressmen?? Guess what the AFSCME Bell Busters were doing then?? The TIU has spent a lot of our dues money printing articles and holding meetings to tell us about the wonderfully efficient AFSCME political lobbying machine. The problem is, our loyal TIU leaders, in their headlong rush to cut a quickie deal with their Bell Buster friends, conveniently neglected to tell us that AFSCME used its political machine to help bust-up our jobs, our contracts, our pension plan, our work locations, our

careers and, in some cases, to bust up our lives.

## THANK YOU TIU

### —AND THANK YOU TOO, AFSCME AND MR. SHAUGHNESSY—

We will never forget how much your Bell Busting team has done for us and for our families. Please go ahead and spend the rest of our dues deductions on lawyers, long legal briefs, appeals, and court appearances. We can hardly wait to receive the one-choice, Russian-style ballot that your Bell Busting team is fighting so hard in court to bring us. It is certainly comforting to know that your only concern is for our welfare.
Issued by: Your IBEW Volunteer Organizing Committee.

There can be no doubt that because Shaughnessy was President of the TIU, and a strong supporter of its affiliation with AFSCME, his integrity and viability as a union advocate was seriously called into question by the IBEW Flier. Even if the Messina Letter could be construed as innocuous, the IBEW Flier cannot. *See* 29 C.F.R. § 452.75 ("[A] union may neither attack a candidate in a union financed publication nor urge the nominations or election of a candidate in a union financed letter to the members."). The handbill does not simply list "facts" concerning affiliation; rather, it is a personal attack which implies, *inter alia,* that Shaughnessy is a "sycophant" who has "busted up" the lives of TIU members. In a presidential race involving only two candidates, the obvious effect of IBEW's scathing indictment of John Shaughnessy's performance as a union representative was to muster support for George Sherwood.

### B.

The defendant claims that its 1984 election for the office of President should not be overturned because "CUTW is not a wrongdoer" in that CWA and IBEW, rather than CUTW, violated section 401(g). Defendant's Memorandum of Law at 10. However, section 401(g) requires the court to determine whether CUTW's election complied with the provisions of the Act; it does not also require the court to place the "blame" for any violation it may find on CUTW. Thus, the question is whether the language of section 401(g), which bars "any labor organization" from using dues to promote the candidacy of "any person" in "an election" requires the court to order a new election where one union has impermissibly promoted a candidate in an election held in a second, unaffiliated union.

The Secretary's position is succinctly set forth in 29 C.F.R. § 452.73. In relevant part, this regulation states:

In the interest of fair union elections, section 401(g) of the Act places two limitations upon the use of labor organization funds derived from dues, assessments, or similar levy. These limitations are: (a) No such funds may be contributed or applied to promote the candidacy of any person in an election subject to Title IV, either in an election within the organization *or in any other labor organization;* and (b) no such funds may be used for issuing statements involving candidates in the election.... (emphasis added)

An agency regulation which interprets a statutory provision, while not dispositive, is ordinarily accorded considerable deference. *See, e.g., United States v. Consumer Life Insurance Co.,* 430 U.S. 725, 751–52, 97 S.Ct. 1440, 1454, 52 L.Ed.2d 4 (1977). The parties have not drawn to the court's attention, and the court has been unable to uncover, any cases in which 29 C.F.R. § 452.73 has been applied. "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue.... If ... the court determines that Congress has not directly addressed the question at issue, ... the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Resources Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694

(1984). The agency's construction need not be the *only* permissible one. *See id.* at 843, n. 11, 104 S.Ct. at 2782 n. 11.

It is arguable that in this case Congress has spoken directly to the precise question at issue. The language of the statute purports to address the activities of "any labor organization," "any person," and "an election." In general, courts have construed the language of section 401(g) according to their plain meaning. *See Donovan v. Local Union 70, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America,* 661 F.2d 1199, 1202 (9th Cir.1981). For example, courts have construed section 401(g)'s directive that "no moneys" be improperly spent to promote a candidate as a clear and unambiguous bar against spending any amount, no matter how *de minimis. See, e.g., Usery v. Stove, Furnace & Allied Appliance Workers,* 547 F.2d 1043, 1045 (8th Cir.1977); *Shultz v. Local Union 6799, United Steelworkers of America,* 426 F.2d 969, 972 (9th Cir.1970), *aff'd,* 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971); *Marshall v. Office and Professional Employees Union, Local 2,* 505 F.Supp. 121, 123 (D.D.C.1981); *Hodgson v. Liquor Salesmen's Union,* 334 F.Supp. at 1378. On its face, section 401(g) prohibits the promotion of a candidate by any labor organization, and does not require the court to establish a relationship between the organization which has promoted the candidate and the organization which is holding the election.

While there are apparently no reported cases construing section 401(g)'s prohibition against "any labor organization" using dues to promote a candidate for union office, other courts have followed the Secretary's lead and have construed the section's similar prohibition against "an employer" as applying to any employer, even if there is no relationship between the contributing employer or business and the candidate or the union. *See Marshall v. Local Union 20, International Brotherhood of Teamsters,* 611 F.2d 645, 651 (6th Cir.1979); *Brock v. Local 538, International Brotherhood of Teamsters,* 645 F.Supp. 156, 157 (W.D.Pa.1986); *Donovan v. Blasters,*

*Drillrunners & Miners Union, Local No. 29,* 521 F.Supp. 595, 597 (S.D.N.Y.1981).

Even if it cannot be said that Congress has spoken directly to the question of whether section 401(g) prohibits one union's expenditure to promote a candidate in another union's election, it is clear to this court that the Secretary's interpretation of that section to prohibit such activity is a permissible one, if not the only permissible one, and is consistent with Congressional intent.

As a general policy, courts do not interfere in the internal affairs of unions. *See Wirtz v. Local 153, Glass Bottle Blowers Assoc.,* 389 U.S. 463, 470–71, 88 S.Ct. 643, 647–48, 19 L.Ed.2d 705 (1968); *Alvey v. General Electric Co.,* 622 F.2d 1279, 1285 (7th Cir.1980). However, the instant action does not deal purely with the internal affairs of one union, but with the apparent, though assertedly unintentional, effect of two unions' activities upon an election in a third union. Moreover, section 401(g) authorizes the Secretary and the court to examine the propriety of and to protect the integrity of union elections. *See Wirtz v. Hotel, Motel & Club Employees Union, Local 6,* 391 U.S. 492, 496–97, 88 S.Ct. 1743, 1746–47, 20 L.Ed.2d 763 (1968): *Donovan v. Local Union 70,* 661 F.2d at 1201. Congress intended to protect both the public interest and the interests of union members by requiring all employers and union organizations to "adhere to the highest standards of responsibility and ethical conduct...." 29 U.S.C. § 401(a). The concern to protect the integrity of union elections is not less where the threat to that integrity is from the activities of another union than when it is from within. In the case of two unrelated unions, collusion between officials could easily frustrate Congress's explicit purpose. *See Donovan v. Local Union 70,* 661 F.2d at 1201. The court doubts that Congress intended to leave a gap so wide in section 401(g).

Congress designed the Act "to curb the possibility of abuse by benevolent as well as malevolent entrenched leaderships." *Wirtz v. Hotel, Motel & Club Em-*

*ployees Union,* 391 U.S. at 503, 88 S.Ct. at 1750. The relevant provisions of Title IV of the Act, of which section 401(g) is a part, are designed to protect the integrity of union elections, not necessarily to punish "wrongdoers." "Thus, good intentions will not excuse a violation of section 401(g)." *Donovan v. National Alliance of Postal & Federal Employees,* 566 F.Supp. 529, 532 (D.D.C.1983), *appeal dismissed mem.,* 740 F.2d 58 (D.C.Cir.1984); *accord, Usery v. Stove, Furnace & Allied Appliance Workers,* 547 F.2d at 1045. The fact that CUTW had no control over the actions of CWA or IBEW officials does not render inconsequential or irremediable their unlawful interference in the CUTW election.[1]

### C.

The proven existence of a violation of section 401(g) establishes a prima facie case that the violation may have affected the outcome of the election, thus placing the burden upon the defendant to introduce "tangible evidence" that the violation did not influence the results. *See Wirtz v. Hotel, Motel & Club Employees Union,* 391 U.S. at 506–07, 88 S.Ct. at 1751–52; *Donovan v. Local Union 70,* 661 F.2d at 1201; *Brennan v. Sindicato Empleados de Equipo Pesado,* 370 F.Supp. 872, 879 (D.P.R.1974). Even "[i]f there is only a single violation and a minimal one at that, it may be more easily rebutted, but it must be met by evidence which supports a finding that the violation did not affect the result." *Usery v. Stove, Furnace & Allied Appliance Workers,* 547 F.2d at 1046.

■ Defendant has provided no evidence which refutes either the violation or the

inference that the Messina Letter and the IBEW Flier affected the outcome of the election. *See Donovan v. National Alliance of Postal and Federal Employees,* 566 F.Supp. at 533; *Marshall v. Office and Professional Employees Union,* 505 F.Supp. at 123. In view of the fact that Shaughnessy, who had held the office of President of CUTW for 26 years, was defeated in an election involving only two candidates, there is a reasonable chance that the literature distributed by CWA and IBEW affected the outcome of the election. "In the absence of any rebuttal evidence, the Court must conclude that the outcome of the election may have been affected." *Donovan v. Local 738, International Union United Automobile, Aerospace & Agricultural Implement Workers,* 575 F.Supp. 52, 55 (D.Md.1983).

■ Once the court finds a violation of section 401(g), it must order the Secretary to conduct a new election "so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization." 29 U.S.C. § 482(c). Neither the fact that Shaughnessy is no longer eligible to run for President of CUTW, nor the fact that CUTW has held its regularly scheduled November 1987 election, of itself renders this action moot. The Supreme Court has held that the Secretary is not to be deprived of the right to a court order directing a new, supervised election merely because new officers have been elected in an intervening, unsupervised, but unchallenged election. *See Wirtz v. Local 153, Glass Bottle Blowers Association,* 389 U.S. at 474–75, 88 S.Ct. at 649–50. In rejecting the argument that to grant relief after a supervening election would terminate the new officer's tenure on mere sus-

---

1. Neither party has cited or relied upon the recent decision of our Court of Appeals in *Brock v. Southern Region, Region III of the Civil Service Employees Association, Inc. Local 1000,* 808 F.2d 228 (2d Cir.1987). However, we should make clear that the holding in *Brock v. Southern Region* does not affect the Court's determination in the instant case.

*Brock v. Southern Region* involved a labor organization within the meaning of the Act which distributed union dues to one of its locals which was *not* subject to the Act. The local union not subject to the Act then used the funds to promote the candidacy of a person in an election

subject to the Act. The court held, *inter alia,* "that a violation of sec. 481(g) requires a showing that, at the time the union dues were improperly expended, the dues were owned or controlled by a labor organization subject to the [Act]." *Id.* at 229.

A "labor organization" subject to the Act is defined at 29 U.S.C. §§ 402(i) and (j). Neither party has presented any evidence which so much as suggests, much less shows, that CUTW, CWA and IBEW are not "labor organizations" within the meaning of the Act. Accordingly, CWA and IBEW's use of union funds to promote a CUTW candidate is covered by section 401(g).

picion, the Court reasoned that to leave untreated the initial unlawfulness "disregards Congress's evident conclusion that only a supervised election could offer assurance that the officers who achieved office as beneficiaries of violations of the Act would not by some means perpetuate their unlawful control in the succeeding election." *Id.* at 474, 88 S.Ct. at 650. The rationale for holding that an intervening election does not render the issue of a previous violation moot must be at its strongest where, as here, the person elected in the intervening but unchallenged election was the same person elected in the tainted election.[2]

If it were closer to the time of the CUTW's next, regularly scheduled election, this court might simply order that that election be held under the supervision of the Secretary. Under the circumstances, however, to allow the President elected in November 1987 to remain in office another two and one-half years would "do a great disservice to the democratic principles that serve as the cornerstone of the [Act]." *Donovan v. CSEA Local Union 1000, AFSCME,* 594 F.Supp. 188, 193 (N.D.N.Y. 1984), *aff'd in part and rev'd in part,* 761 F.2d 870 (2d Cir.1985); *cf. Usery v. International Organization of Masters, Mates and Pilots,* 538 F.2d at 952 (modifying district court's order requiring immediate new election because regularly scheduled election was to be held in approximately one year).

### CONCLUSION

Accordingly, the court hereby grants the relief requested by the Secretary, and or-

---

**2.** By letter to the court dated November 9, 1987 (formally filed Mar. 25, 1988), plaintiff contended, relying on *Wirtz v. Local 153, Glass Bottle Blowers Association,* 389 U.S. at 475, 88 S.Ct. at 650, that the occurrence of an intervening election and the outcome thereof had no bearing upon the appropriateness of the relief here requested, once a violation of section 401(g) had been found. In that letter plaintiff also indicated that this contention had been discussed with defendant, and that defendant had agreed with it, but that defendant was thereby invited to advise the court if it differed in any way. Defendant has not communicated to the court that it has any other view of the matter.

ders defendant to conduct a re-run election for the office of President of CUTW under the Secretary's supervision within ninety (90) days of the date of this order. *See Usery v. Stove, Furnace & Allied Appliance Workers,* 547 F.2d at 1047 (ordering new election only for officers whose election was tainted). The newly elected President shall hold office until the CUTW's next regularly scheduled election, which presumably will be held in November 1990.

IT IS SO ORDERED.

It should be noted, however, that our Court of Appeals in *Usery v. International Organization of Masters, Mates and Pilots,* 538 F.2d at 950–951, has interpreted *Glass Bottle Blowers* not to speak specifically to the details of an appropriate remedy in cases where an unsupervised election has intervened. The Court of Appeals teaches that the remedies in such cases should be guided by consideration of "the practicality of the situation" and of "whether equity commands" a particular remedy, including considerations of timing, expense, and whether the persons now in office were elected without electoral taint. This court has reached its conclusion mindful of that teaching and for the reasons heretofore and hereinafter stated.